[No. F006329. Fifth Dist. Apr. 10, 1987.]

RUBEN J. ROSE et al., Plaintiffs and Appellants, v.
CITY OF COALINGA, Defendant and Respondent.

1628

**COUNSEL**

Miles, Sears & Eanni and Donald R. Franson, Jr., for Plaintiffs and Appellants.

Lerrigo, Snyder, Nibler, Moss & Berryman and Catherine Adams Bennett for Defendant and Respondent.

**OPINION**

**BEST, Acting P. J.**—Ruben J. Rose and his wife, Pauline V. Rose (appellants) appeal from a summary judgment entered in favor of the City of Coalinga (City) in this action for inverse condemnation filed as a result of the destruction of appellants' building by the City following the Coalinga earthquake which occurred on May 2, 1983.

The central issues are: (1) May an action in inverse condemnation be maintained, or is appellants' sole remedy in an action in tort? (2) If an action in inverse condemnation can be maintained, are there conflicting inferences that may be drawn by a trier of fact rendering the granting of a summary judgment improper?

FACTS[1]

The material facts established by declarations filed in support and opposition to the motion for summary judgment and by excerpts from depositions are not in dispute.

Appellants were the owners of a commercial building located at 155 East Elm Avenue, in the City of Coalinga, when the May 2, 1983, earthquake occurred. They were in Texas at the time of the earthquake and returned to Coalinga May 6, 1983. Because the area surrounding their building was fenced off from the public, they were unable to visit their building when they arrived. The next day, however, Saturday, May 7, 1983, appellants went to the Coalinga City Hall to talk with Alan Jacobsen, the public works director, or Glen Marcussen, the city manager, to obtain permission to inspect any damage that might have occurred to their building. Those gentlemen were not available. On Monday, May 9, 1983, appellants again attempted to talk with Marcussen and Jacobsen, but again were informed that neither was available. Later that day, however, appellants were able to gain admittance into the restricted area, along with a local contractor. After walking through and inspecting the building, the contractor and appellants agreed that the damage to the building was not severe. The contractor recommended that appellants obtain an architect's report to support their claim that the building could be repaired.

On May 10, 1983, a meeting of downtown property owners was held at the Coalinga City Hall. The city attorney presided over the meeting and explained to all present that the majority of the downtown area (where appellants' building was located) was going to be demolished due to earthquake damage. Several exceptions were listed, but appellants' building was not among the exceptions.

The city attorney said the buildings had to come down for the health, safety, and welfare of the City. He explained that if the landowners refused to give the City permission to demolish their buildings, then a court would order the destruction, and the property owner would pay the entire demolition cost. The city attorney stated that if consent were given, the landowner would bear no demolition cost.

At the end of this meeting, typewritten "releases"[2] were handed to the

---

[1]This summary of facts is taken from appellants' brief as the City has stated in its brief, "For the purposes of this proceeding [City] will agree to appellants' statement of facts."

[2]These releases essentially provided that the owners' "consent to the demolition of [their] building . . . [at] no cost to the [owners], . . . [and] further agree to hold harmless the City . . . from any consequences of [the] demolition."

property owners for their signatures. The owners were told they had 48 hours to sign the release or court proceedings would be commenced to carry out the demolition of their buildings.

On Wednesday, May 11, 1983, an architect examined appellants' building at appellants' request to determine whether the building was repairable. Following the inspection, the architect told appellants that their building could be repaired for less than the cost of rebuilding if it was torn down, and he would outline his final conclusions in a letter.

During the afternoon of May 11, 1983, appellants went to the city hall and obtained a copy of a structural safety inspection report on their building prepared by the state Office of Emergency Services. After reading this report, appellants again attempted to talk with Jacobsen and Marcussen about it. Again, neither Jacobsen nor Marcussen was available.

The Office of Emergency Services structural safety report had been completed and submitted to the City on May 9, 1983; it concluded there was "no hazard found" in appellants' building. This report was prepared by two licensed structural engineers who both later testified in depositions that appellants' building was repairable and should not have been demolished.

On Friday, May 13, 1983, appellants received a copy of their architect's May 11, 1983, report in the mail. The report concluded that appellants' "building could be remodeled and brought to present-day codes and standards." Appellants made several copies of this report and then went to the Coalinga City Hall to talk with Jacobsen about the conclusions in the report. Jacobsen was in his office, and, after receiving the report, he nevertheless told appellants that it would "make no difference, all of the buildings are coming down." Appellants were very upset at Jacobsen's decision and were adamant in expressing their belief that their building was repairable and that they did not want it demolished. Jacobsen again explained that the decision had been made, it was final, and appellants' building was to be demolished.

Later that day, appellants signed the consent form allowing the City to demolish their building. They did so only because Jacobsen had told them that the decision was final and that they had no alternative.

On Friday evening, May 13, 1983, another downtown property owners' meeting was held. Marcussen presided over the meeting and put up a map of the downtown area showing which buildings were to be demolished. The

city attorney again explained to the group that if the releases were not signed and returned, the buildings would be torn down pursuant to court order, with the property owner bearing the expense. Appellants turned in their signed release at this meeting.

Following the May 13, 1983, meeting, appellants made several more attempts to talk with Jacobsen and Marcussen to convince them that their building need not be torn down. However, each time they went to the city hall, they were informed that neither Jacobsen nor Marcussen was available. The demolition of the downtown buildings began about June 6, 1983. Appellants were never informed by city personnel of the actual date their building was to be destroyed. On June 29, 1983, appellants received a telephone call from Jacobsen's office advising them that their building would be destroyed in two hours; it was demolished that day.

## DISCUSSION

Essentially, the City takes the position that, assuming the City's decision to demolish appellants' building was wrongful, erroneous and unnecessary, as a matter of law appellants' sole remedy was by way of an action in tort; since appellants did not file a claim pursuant to the California Tort Claims Act (see Gov. Code, § 905 et seq.), no action in tort could be maintained.[3]

Though somewhat ambiguous, it appears from the trial court's memorandum of decision that the court agreed with the City, stating in part: "Assuming these facts [that no emergency existed and the building was in fact structurally sound] to be true, there was no taking by the City or use by the City of the Plaintiffs' property. Thus, there was no condemnation or inverse condemnation. This is not properly an inverse condemnation situation, but is an emergency exercise of the City's police power. *Knapp v. City of Newport Beach* (1960) 186 Cal.App.2d 669, *Holtz v. Superior Court* (1970) 3 Cal.3d 296. Here there was certainly no formal intent by the City to condemn. See *Friedman v. City of Fairfax,* (1978) 81 Cal.App.3d 667, 677.

"Had no emergency in fact existed here, as Plaintiffs now appear to contend, the City's action would have been tortious, perhaps even malicious. . . .

---

[3]No claim is required as a prerequisite to an action in inverse condemnation. (Gov. Code, § 905.1.)

"... Yet, there is no evidence before the Court that this demolition was performed for any reason other than to protect the health, safety and welfare of Coalinga citizens following a devastating earthquake. Furthermore, there is no evidence whatsoever that the demolition was done by the City for any kind of use. There is no evidence before the Court that the City intended to take Plaintiffs' property."

Both the City and the trial court are in error.

Article I, section 19 of the California Constitution provides that "Private property may be taken or damaged for public use only when just compensation ... has first been paid to ... the owner." This provision is self-executing. (*Rose* v. *State of California* (1942) 19 Cal.2d 713, 720 [123 P.2d 505].)

■ When private property is wrongfully damaged or destroyed in the course of governmental action and the government has not first undertaken procedures to guarantee due process to the owner, such as an action in eminent domain or proceedings to declare a condition a nuisance, then, absent an emergency giving rise to the proper exercise of the police power, an action in inverse condemnation by the owner against the governmental agency will lie to establish the damages suffered by the owner. (*Holtz* v. *Superior Court* (1970) 3 Cal.3d 296, 301-303 [90 Cal.Rptr. 345, 475 P.2d 441]; *Breidert* v. *Southern Pacific Company* (1964) 61 Cal.2d 659, 663, fn. 1 [39 Cal.Rptr. 903, 394 P.2d 719]; *Friedman* v. *City of Los Angeles* (1975) 52 Cal.App.3d 317, 321-322 [125 Cal.Rptr. 93]; *Leppo* v. *City of Petaluma* (1971) 20 Cal.App.3d 711 [97 Cal.Rptr. 840], review den.; Van Alstyne, Cal. Government Tort Liability Practice (Cont.Ed.Bar 1980) § 2.10, pp. 41-43, Supp. § 2.10, pp. 8-9.)

An action in inverse condemnation arises directly from the constitutional provision (art. I, § 19) and is independent of any right to sue under traditional tort theories. (*Friedman* v. *City of Los Angeles, supra*, 52 Cal.App.3d at p. 321; *Albers* v. *County of Los Angeles* (1965) 62 Cal.2d 250, 260 [42 Cal.Rptr. 89, 398 P.2d 129].) The right to sue in inverse condemnation is "fundamentally rooted" in the Constitution, and the extent of a public entity's liability is fixed by the Constitution and not by rules of statutory or common law rights and responsibilities between private parties. (*Holtz* v. *Superior Court, supra*, 3 Cal.3d at pp. 301-303.)

Most inverse condemnation actions arise out of unintentional or negligent damage to an owner's property or property interests arising out of the construction of public works. For example: see *Rose* v. *State of California*,

*supra,* 19 Cal.2d 713—abutter's right to ingress and egress to and from the public street damaged by improvement to the roadway; *House* v. *L. A. County Flood Control Dist.* (1944) 25 Cal.2d 384 [153 P.2d 950]—flood damages to owner's property caused by negligent planning and construction of a bank or wall on a flood control project; *Aetna Life & Casualty Co.* v. *City of Los Angeles* (1985) 170 Cal.App.3d 865 [216 Cal.Rptr. 831]— damages to homes resulting from a brush fire caused by sparks from City of Los Angeles electrical transmission lines.

■ The second situation authorizing an action in inverse condemnation is where a governmental body, in the exercise of its police power to protect the public health, safety and welfare, intentionally destroys an owner's property in the absence of an emergency and compelling necessity and without according to the owner due process. As *House* v. *L. A. County Flood Control Dist., supra,* 25 Cal.2d 384, 391, explains: "Unquestionably, under the pressure of public necessity and to avert impending peril, the legitimate exercise of the police power often works not only avoidable damage but destruction of property without calling for compensation. Instances of this character are the demolition of all or parts of buildings to prevent the spread of conflagration, or the destruction of diseased animals, of rotten fruit, or infected trees where life or health is jeopardized. In such cases calling for immediate action the emergency constitutes full justification for the measures taken to control the menacing condition, and private interests must be held wholly subservient to the right of the state to proceed in such manner as it deems appropriate for the protection of the public health or safety. (18 Am.Jur. 778; 29 C.J.S. 784.)"

Quoting from *Archer* v. *City of Los Angeles* (1941) 19 Cal.2d 19, 23-24 [119 P.2d 1], the *House* court further instructs: " 'The state or its subdivisions may take or damage private property without compensation if such action is *essential* to safeguard public health, safety or morals. [Citing authorities.] *In certain circumstances, however, the taking or damaging of private property for such a purpose is not prompted by so great a necessity as to be justified without proper compensation to the owner.* [Citing authorities.]' (Italics added.) Thus there is recognized the incontestable proposition that the exercise of the police power, though an essential attribute of sovereignty for the public welfare and arbitrary in its nature, cannot extend beyond the necessities of the case and be made a cloak to destroy constitutional rights as to the inviolateness of private property." (*House* v. *L. A. County Flood Control Dist., supra,* 25 Cal.2d at pp. 388-389; see also *Friedman* v. *City of Los Angeles, supra,* 52 Cal.App.3d 317, 321; 1 Nichols, Law of Eminent Domain (3d rev. ed. 1975) § 1.42[15], pp. 1-459–1-461.)

*Leppo* v. *City of Petaluma, supra,* 20 Cal.App.3d 711 is in point. The city council, by resolution, determined that plaintiff's building was unsafe for occupancy, declared it a public nuisance and proceeded to destroy it without a judicial determination that the building constituted a nuisance. The plaintiff owner disputed the city's determination. In this inverse condemnation action the court held that the burden of proving that the building was an immediate hazard was on the city and awarded damages to the owner. The appellate court affirmed, holding that the city had not met its burden of proving that the building was a nuisance and constituted an immediate hazard and danger to the public at the time of the destruction. The court concluded: "We conclude that in emergency situations the city may act summarily to abate a nuisance, but in such case the city must be prepared to establish by a preponderance of evidence that an emergency actually existed." (*Id.* at p. 719.)

Contrary to the trial court's memorandum of decision, these principles apply whether the governmental subdivision intends to exercise the power of eminent domain or actually takes possession of the property destroyed or damaged. All the appellants must show is that " ' ". . . the damage resulted from an exercise of governmental power while seeking to promote 'the general interest in its relation to any legitimate object of government.' " ' " (*Baker* v. *Burbank-Glendale-Pasadena Airport Authority* (1985) 39 Cal.3d 862, 867 [218 Cal.Rptr. 293, 705 P.2d 866]; see also *County of Los Angeles* v. *Anthony* (1964) 224 Cal.App.2d 103, 106 [36 Cal.Rptr. 308]; *Frustuck* v. *City of Fairfax* (1963) 212 Cal.App.2d 345, 364 [28 Cal.Rptr. 357].)

The City's contention that appellants waived any right to bring an action against the City by their failure to take legal action to prohibit the demolition of their building prior to its actual date of destruction has been rejected in *Leppo* v. *City of Petaluma, supra,* 20 Cal.App.3d 711, 716-717. We agree with *Leppo.*

Because this is an appeal from a summary judgment granted to the City, to obtain a reversal appellants need only establish that a triable issue of fact exists. (Code Civ. Proc., § 437c; *Zeilman* v. *County of Kern* (1985) 168 Cal.App.3d 1174, 1178-1179 [214 Cal.Rptr. 746].) From the facts related, it is apparent that questions of fact exist for resolution by a trier of fact in at least two respects. First, conflicting inferences may be drawn as to whether there was a true emergency caused by the subject building being an imminent hazard to the public's health and safety, justifying its destruction. Plaintiffs' contractor, architect and the state Office of Emergency Planning concluded the building was not a hazard. Further, the property was fenced off, and the City waited 57 days before the building was destroyed.

Secondly, there is a triable issue as to whether appellants voluntarily consented to the destruction of their building by reason of the execution of the City's consent form. In this regard, there are factual questions regarding whether in signing the form appellants acted freely and voluntarily or under the influence of duress and misrepresentation which afforded appellants no reasonable alternative.

For the foregoing reasons, the judgment must be reversed.

The judgment is reversed. Appellants to have their costs on appeal.

Ballantyne, J., and Harris, J.*, concurred.

A petition for a rehearing was denied May 6, 1987, and respondent's petition for review by the Supreme Court was denied June 24, 1987.

---

*Assigned by the Acting Chairperson of the Judicial Council.