SINALOA LAKE OWNERS
ASSOCIATION, et al.,
Plaintiffs/Appellants,

v.

CITY OF SIMI VALLEY,
Defendant/Appellee,

James Doody, et al.,
Defendants-cross-defendants/Appellees.

v.

Donald G. TUDOR; Jennie P. Tudor, et al., Third-party-defendants/Appellees,

County of Ventura,
Defendant-third-party-plaintiff/
cross-claimant

No. 86–6425.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 5, 1988.

Decided Jan. 6, 1989.

As Amended March 23, 1989.

As Amended on Denial of Rehearing and Rehearing En Banc Aug. 9, 1989.

---

Michael M. Berger and M. Reed Hunter, Fadem, Berger & Norton, Los Angeles, Cal., for plaintiffs-appellants.

Walter G. Mortensen, Spray, Gould & Bowers, Ventura, Cal., for defendant-third-party-plaintiff-cross-claimant County of Ventura.

Henry J. Walsh and Carol A. Woo, Lawler, Bonham & Walsh, Ventura, Cal., for defendant-appellee City of Simi Valley.

Joel A. Davis, Deputy Atty. Gen., Los Angeles, Cal., for defendants-cross-defendants-appellees Doody, Persson, Jacinto, Ley, Stephenson and McEwan.

Before BRUNETTI, KOZINSKI and THOMPSON, Circuit Judges.

KOZINSKI, Circuit Judge:

We consider whether plaintiffs' fourth, fifth and fourteenth amendment claims are ripe for adjudication in federal court despite failure to exhaust state judicial remedies.

### Facts

The complaint and stipulations of the parties set forth the following scenario:[1] Plaintiff Sinaloa Lake Owners Association owns Sinaloa Dam and Sinaloa Lake, the lake behind the dam. The individual plaintiffs own property surrounding the lake. The lake and the dam are located within the County of Ventura, outside the City of Simi Valley.

The California Division of Safety of Dams (DSOD), a division of the California Department of Water Resources, is responsible for inspecting non-federally owned dams in California. On February 11, 1983, after conducting an inspection of Sinaloa Dam, DSOD sent a letter to James Stutzman, former president of the Association, directing the Association to take certain corrective actions and report back to DSOD no later than March 15, 1983.

Between February 25 and March 3, heavy rains raised the water level of Sinaloa Lake. On March 2, there were two slides on the face of the dam. Plaintiffs allege that these slides were caused by (1) a leak in a city-owned high-pressure water

---

1. We treat the parties' stipulations as pro tanto amendments of the pleadings.

pipe running through the dam; (2) the county's actions in raising the dam's spillway, which allowed more water to accumulate behind the dam; and (3) the heavy rains. City officials immediately evacuated residents living below the dam and began pumping water out of the lake.

On March 3, defendant David Jacinto, a DSOD Associate Field Engineer, arrived at the dam and assumed control of the situation. He took additional steps to reduce the water level behind the dam. The Army Corps of Engineers inspected the dam and concluded it was stable.

On March 4, without advising plaintiffs, DSOD officials decided to breach the dam in order to drain the lake; this decision was not implemented immediately. By the next day, the water level was 10 to 12 feet below the high water mark. The city decided that the emergency was over, and advised evacuated residents to return to their homes.

On March 6, defendant James Doody, Division Chief of DSOD, countermanded the decision to breach the dam, and instead ordered workers to proceed with plans to lower the spillway. By March 8 the emergency was over: The water level was down 22 feet and DSOD promised to maintain that level to enable the Association to maintain fish in the lake.

On March 10, at the direction of DSOD, workers began lowering the spillway in order to reduce the risk of future problems. By that time, however, defendant Doody and other senior officials of DSOD had once again decided to breach the dam. The plaintiffs were not advised of the latest decision until a few hours before DSOD contractors were scheduled to begin breaching the dam at 4:00 p.m. on Friday, March 11.

In an attempt to obtain a temporary restraining order, plaintiffs secured an informal hearing before a Superior Court Judge that afternoon. The judge refused to act, however, because plaintiffs were unable to produce a completed engineering study or testimony from an engineer showing that the dam was safe. DSOD produced no evidence indicating that the dam was unsafe. No order was entered and no record was made of the in-camera proceedings; apparently the matter was not even assigned a case number. Immediately after the hearing, DSOD's contractors breached the dam, lowered the water level 25 feet from the high water mark, and drained 90 percent of the water from Sinaloa Lake.

Plaintiffs filed suit under 42 U.S.C. § 1983 on December 16, 1983, alleging deprivation of their fourth, fifth and fourteenth amendment rights. Their second amended complaint was filed on July 2, 1984. On May 15, 1986, a month before the case was scheduled to go to trial, defendants moved for judgment on the pleadings, claiming that the case was not ripe for decision. The district court granted the motion as to all defendants. After their motion to amend the judgment was denied, plaintiffs timely appealed.

### Discussion

We review the district court's grant of judgment on the pleadings de novo, taking all material allegations of the non-moving party as true and construing them in the light most favorable to that party. Judgment on the pleadings will not be granted unless "the allegations of the complaint itself clearly demonstrate that plaintiff does not have a claim." 5 C. Wright & A. Miller, *Federal Practice & Procedure* § 1357, at 604 (1969). Motions for judgment on the pleadings, like motions to dismiss for failure to state a claim, must be viewed with particular skepticism in cases involving claims of inverse condemnation. *See Hall v. City of Santa Barbara,* 833 F.2d 1270, 1274 (9th Cir.1986), *cert. denied,* — U.S. ——, 108 S.Ct. 1120, 99 L.Ed.2d 281 (1988).

### I

Plaintiffs claim that defendants' actions in breaching the dam and destroying the lake amounted to a taking of their property without just compensation, in violation of the fifth amendment. Defendants argue, and the district court held, that this

claim is not ripe because plaintiffs have failed to exhaust their state remedies.

Defendants rely on *Williamson County Regional Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), which places two hurdles in the way of a taking claim brought in federal court against states and their political subdivisions. First, *Williamson County* affirmed the principle that "a claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Id.* at 186, 105 S.Ct. at 3116. As we held in *Hall,* however, *Williamson County*'s final decision requirement is inapplicable in cases of physical invasion. 833 F.2d at 1282 n. 28. A physical taking, such as the one at issue here, is by definition a final decision, and thereby satisfies *Williamson County*'s first exhaustion requirement.

The second, and independent, hurdle established by *Williamson County* requires plaintiffs to "seek compensation through the procedures the State has provided for doing so" before turning to the federal courts. *Id.* at 194–95, 105 S.Ct. at 3120–21. The Court reasoned that "[t]he Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation." *Id.* So long as the state provides "an adequate process for obtaining compensation," no constitutional violation can occur until the state denies just compensation. *Id.*

Plaintiffs, citing footnote 28 of *Hall,* contend that the second requirement of *Williamson County* is also inapplicable to physical invasion cases. That footnote, however, only relieves plaintiffs of the obligation to exhaust administrative remedies in physical taking cases—it does not excuse them from seeking just compensation through state procedures. Even in physical taking cases, compensation must first be sought from the state if adequate procedures are available.

Contrary to plaintiffs' assertions, this interpretation of *Hall* does not conflict with *Williamson County. Williamson County* only requires exhaustion of state judicial remedies when the state provides "an adequate process for obtaining compensation." 473 U.S. at 194, 105 S.Ct. at 3120. Plaintiffs need not bring a state court action when it would be futile under existing state law. *Williamson County,* 473 U.S. at 196–97, 105 S.Ct. at 3121–22; *Kinzli v. City of Santa Cruz,* 818 F.2d 1449, 1455 (9th Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 775, 98 L.Ed.2d 861 (1988); *Furey v. City of Sacramento,* 780 F.2d 1448, 1450 n. 1 (9th Cir.1986). Although the alleged taking in *Hall* amounted to a physical invasion, it was effected by a city ordinance. At the time the ordinance was passed, no action for inverse condemnation based on a regulatory taking could be brought under California law; the landowner's sole remedy was to seek invalidation of the offending statute. *See Agins v. City of Tiburon,* 24 Cal.3d 266, 274–77, 598 P.2d 25, 29–31, 157 Cal.Rptr. 372, 376–78 (1979), *aff'd on other grounds,* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980); *see also Furey,* 780 F.2d at 1450 n. 1. Although the Supreme Court later expressly disapproved this aspect of California law, *see First English Evangelical Lutheran Church v. County of Los Angeles,* 482 U.S. 304, 107 S.Ct. 2378, 2387, 96 L.Ed.2d 250 (1987), the appropriate point for determining the adequacy of state compensation procedures is at the time the alleged taking occurs. *See Williamson,* 473 U.S. at 194, 105 S.Ct. at 3120 ("all that is required is that a "'reasonable, certain and adequate provision for obtaining compensation'" exist *at the time of the taking*") (emphasis added; citations omitted).

Unlike *Hall,* the taking here was effected by direct governmental action, not by an ordinance. California law has long provided a damages remedy for this type of taking claim. *See Holtz v. San Francisco Bay Area Rapid Transit Dist.,* 17 Cal.3d 648, 652, 552 P.2d 430, 433, 131 Cal.Rptr. 646, 649 (1976); *Rose v. City of Coalinga,* 190 Cal.App.3d 1627, 1633–35, 236 Cal.Rptr. 124, 127–29 (1987). Thus, plaintiffs can

obtain compensation under state law, a remedy they have not taken advantage of.

■ Plaintiffs argue that state remedies are inadequate because of the long delays before cases go to trial, and because of what they suggest is the California courts' longstanding hostility toward taking claims. They offer nothing to substantiate their claim that they will suffer unreasonable delay in state court, other than the bare assertion that their case would not go to trial for four years or more. Such a generalized assertion falls far short of the evidence needed to show the futility of resorting to state courts for relief. Indeed, the published available data seems to paint a different picture. According to information provided by the Ventura County Superior Court to the Judicial Council of California, the median time between the filing of a complaint and trial in civil non-jury cases in 1987 was less than three years. *See* Letter from Jay S. Widdows, Administrative Assistant, Ventura County Superior Court, to Alex Kozinski, Circuit Judge (July 22, 1988) (attaching data on median length of time for complaint-to-trial and at-issue memorandum-to-trial in Ventura County Superior Court).[2] Moreover, the time from filing to trial is not a particularly helpful measure of delay in a state like California, which allows a plaintiff up to three years from date of filing to effect service. Cal.Civ. Proc.Code § 583.210 (West Supp.1988). A more meaningful measure of delay is the time between the filing of the at-issue memorandum and trial, since filing of the at-issue memorandum places the matter on the civil active list. Cal.Super.Ct.R. 209 (West Supp.1988). That period was less than 8 months for civil nonjury trials and less than 10 months for civil jury trials in Ventura County in 1987. We cannot say that this delay is so excessive as to render resort to the state court system futile.

■ Nor are we swayed by the alleged "reluctance of the California State Court system to lend a sympathetic ear to private property owners in just compensation cases." Appellants' Opening Brief at 29. California courts have held on similar facts that property owners are entitled to present their claims for just compensation to a jury. *See, e.g., Archer v. City of Los Angeles,* 19 Cal.2d 19, 24, 119 P.2d 1, 4 (1941) ("[i]n certain circumstances ... the taking or damaging of private property [to safeguard public health, safety or morals] is not prompted by so great a necessity as to be justified without proper compensation to the owner"); *Rose v. City of Coalinga,* 190 Cal.App.3d at 1635–36, 236 Cal.Rptr. at 128–29 (dispute over existence of emergency warranting destruction of private property and over grant of consent by owners to that act required dismissal of summary judgment); *Leppo v. City of Petaluma,* 20 Cal.App.3d 711, 719, 97 Cal.Rptr. 840, 844 (1971) (damages appropriate where city failed to establish evidence of emergency justifying destruction of building). Plaintiffs do not explain why they fear that right will be denied them. We conclude that California provides plaintiffs an adequate procedure for obtaining just compensation.

■ Finally, plaintiffs assert that defendants are barred by laches from raising *Williamson County* as a defense.[3] Defen-

---

**2.** We take judicial notice of these figures, contained in the reports of a public body, pursuant to Fed.R.Evid. 201(b)(2).

**3.** Plaintiffs filed this lawsuit in December 1983, yet it was not until May 1986, one month before trial was to begin, that defendants first raised a ripeness challenge. It is clear they knew from the beginning that plaintiffs had not exhausted their state compensation remedies. Moreover, even before *Williamson County* was decided in June 1985, defendants were on notice that claims under the just compensation clause were not ripe until available state compensation remedies had been exhausted. *See Williamson*

County, 473 U.S. at 194–95, 105 S.Ct. at 3120–21 (citing *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1013, 1018 n. 21, 104 S.Ct. 2862, 2878, 2880–81 n. 21, 81 L.Ed.2d 815 (1984)).

The district court also expressed concern about this delay:

> [N]one of the defendants had ever moved to question the propriety of the case being here [in federal court] until here we are about one week before trial. I consider that to be dilatory and not in the best interest of the clients, necessarily. This request should have been raised at the outset in this case.

Reporter's Transcript, June 16, 1986, at 1–2.

dants respond that laches cannot bar their *Williamson County* defense because the failure to seek compensation in state court renders the taking claim unripe, and lack of ripeness deprives the court of subject matter jurisdiction. *See Austin v. City and County of Honolulu,* 840 F.2d 678, 682 (9th Cir.1988). We agree with defendants that ripeness is a jurisdictional requirement and lack of subject matter jurisdiction may not be waived.[4]

## II

The due process clause protects individuals against governmental deprivations of property without due process of law. U.S. Const. amend. XIV, § 1. Plaintiffs contend that the DSOD's actions in breaching the dam and destroying the lake without providing plaintiffs adequate notice or a hearing amounted to a violation of due process.

■ A. As a threshold matter, we reject defendants' contention that the second prong of *Williamson County* requires exhaustion of available state compensation remedies before plaintiffs may pursue their due process claim in federal court. This requirement, derived from "the special nature of the Just Compensation Clause," 473 U.S. at 196 n. 14, 105 S.Ct. at 3121, states only that the just compensation clause cannot be violated until the state has subsequently declined to pay for the taking; it has no application to other types of constitutional claims, even where those claims arise out of facts that also give rise to a taking claim.

■ Thus, the rationale for requiring exhaustion of state compensation remedies in taking cases does *not* extend to a claim that plaintiffs were denied due process.[5]

Indeed, the Supreme Court in *Williamson County* expressly distinguished procedural due process claims from taking claims, stating that due process may be violated regardless of the availability of post-deprivation remedies. *See* 473 U.S. at 195–96 n. 14, 105 S.Ct. at 3121 n. 14. It is of no moment that this due process claim is based on factors that also form the basis of an alleged taking. Two or more legal theories may cover the same conduct and a plaintiff is entitled to prove each claim according to its terms. Accordingly, we reject the contention that *Williamson County* requires plaintiffs to seek relief in state court for the alleged violation of their right to due process.

*Norco Construction, Inc. v. King County,* 801 F.2d 1143 (9th Cir.1986), and its progeny are not to the contrary. We held in *Norco* that a plaintiff's failure to obtain "a final determination on the status of the property" rendered his equal protection and due process claims unripe under *Williamson County. Id.* at 1145; *see also Shelter Creek Dev. Corp. v. City of Oxnard,* 838 F.2d 375, 379 (9th Cir.1988); *Kinzli,* 818 F.2d at 1455–56. The holdings in these cases are limited to *Williamson County*'s first exhaustion requirement, which applies to all challenges to regulatory takings, whether based on the just compensation clause, the due process clause, the equal protection clause or the fourth amendment: Regardless of the type of claim, it is generally impossible to determine the extent of the infringement absent a final determination by the relevant governmental body. Once a final determination has been made, however, the mere fact that a taking is alleged does not create a

---

**4.** Although plaintiffs' taking claim is not ripe for our review, it would be entirely appropriate on remand for the district court, in the interest of judicial economy and particularly in view of defendants' undue delay in raising *Williamson County, see* note 3 *supra,* to permit plaintiffs to amend their complaint to include a pendent state law taking claim. *See, e.g., Rose v. City of Coalinga,* 190 Cal.App.3d at 1633–35, 236 Cal. Rptr. at 127–29.

**5.** We note that the Supreme Court was faced only with a taking claim in *Williamson County;*

plaintiffs did not appeal the denial of their substantive and procedural due process and equal protection claims. 473 U.S. at 182 n. 4, 105 S.Ct. at 3114 n. 4. Although plaintiffs did argue that the due process clause forbids the exercise of police power that amounts to a taking, the Court held the claim unripe under the first *Williamson County* ripeness prong. The Court therefore did not need to reach the second *Williamson County* requirement that just compensation must first be sought through state procedures. 473 U.S. at 199–200, 105 S.Ct. at 3123.

further exhaustion requirement for non-taking claims.

Nor does *Cassettari v. County of Nevada*, 824 F.2d 735 (9th Cir.1987), teach otherwise. Although we stated in *Cassettari* that "[t]he Constitution ... does not require a state to provide pre-taking notice [or] an opportunity to be heard," *id.* at 738, it is clear that we were speaking of the just compensation clause, not the due process clause. Indeed, our only support for this proposition was the Supreme Court's statement that " '[t]he *Just Compensation Clause* has never been held to require pre-taking process.' " *Id.* at 738–39 (quoting *Williamson County*, 473 U.S. at 196 n. 14, 105 S.Ct. at 3121 n. 14) (emphasis added). *Cassettari* certainly does not purport to hold, in contravention to long-established principles of due process, that the government need never provide process before depriving individuals of their property interests.

■ B. We turn to the merits of plaintiffs' due process claim. At the core of the due process clause is the right to notice and a hearing "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). "Ordinarily, due process of law requires an opportunity for 'some kind of hearing' *prior* to the deprivation of a significant property interest." *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 19, 98 S.Ct. 1554, 1565, 56 L.Ed.2d 30 (1978) (emphasis added); *see Hodel v. Virginia Surface Mining & Recl. Ass'n*, 452 U.S. 264, 299, 101 S.Ct. 2352, 2372, 69 L.Ed.2d 1 (1981); *Fuentes v. Shevin*, 407 U.S. 67, 81–82, 92 S.Ct. 1983, 1994–95, 32 L.Ed.2d 556 (1972); *Boddie v. Connecticut*, 401 U.S. 371, 378–79, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971); *Tom Growney Equipment, Inc. v. Shelley Irrigation Dev., Inc.*, 834 F.2d 833, 835 (9th Cir.1987). Only in extraordinary circumstances involving " 'the necessity of quick action by the State or the impracticality of providing any [meaningful] predeprivation

process' " may the government dispense with the requirement of a hearing prior to the deprivation. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436, 102 S.Ct. 1148, 1158, 71 L.Ed.2d 265 (1982) (quoting *Parratt v. Taylor*, 451 U.S. 527, 539, 101 S.Ct. 1908, 1914–15, 68 L.Ed.2d 420 (1981)).

Defendants contend that *Parratt v. Taylor* forecloses the plaintiffs' due process claim. *Parratt* held that the deprivation of property "as a result of a random and unauthorized act by a state employee," 451 U.S. at 541, 101 S.Ct. at 1916, does not violate due process, so long as there is no showing that post-deprivation procedures for obtaining compensation are inadequate or "that it was practicable for the State to provide a predeprivation hearing." *Id.* at 543, 101 S.Ct. at 1916–17. Plaintiffs, however, do not allege that the injury to their dam was the result of the "random and unauthorized act of a state employee." All parties agree that the decision was made by senior DSOD officials under color of the authority vested in DSOD by California Water Code §§ 6100, 6102, 6110–6112 (West 1971).[6] As we stated in *Piatt v. MacDougall*, 773 F.2d 1032, 1036 (9th Cir. 1985) (en banc):

Where the state has procedures, regulations or statutes designed to control the actions of state officials, and those officials charged with carrying out state policy act under the apparent authority of those directives, it makes no sense to say either that their conduct is "random" or that it is impossible for the state to provide a hearing in advance of the deprivation. The considerations underlying *Parratt* are simply inapplicable....

Plaintiffs' claims are not barred by *Parratt*.

■ The principle announced in *Parratt* is not, however, the only exception to the general requirement of notice and an opportunity to be heard prior to the deprivation of property. The Supreme Court has repeatedly held that summary governmen-

---

**6.** Pursuant to these statutes, the DSOD supervises "the maintenance and operation of dams and reservoirs insofar as necessary to safeguard life and property from injury by reason of the fail-

ure thereof," Cal.Water Code § 6100, and "may in emergency ... [t]ake such ... steps as may be essential to safeguard life and property." *Id.* § 6111.

tal action taken in emergencies and designed to protect the public health, safety and general welfare does not violate due process. *See, e.g., Hodel v. Virginia Surface Mining & Recl. Ass'n,* 452 U.S. 264, 299–300, 101 S.Ct. 2352, 2372, 69 L.Ed.2d 1 (1981); *Calero–Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 677–80, 94 S.Ct. 2080, 2088–90, 40 L.Ed.2d 452 (1974); *Ewing v. Mytinger & Casselberry, Inc.,* 339 U.S. 594, 599–600, 70 S.Ct. 870, 872–73, 94 L.Ed. 1088 (1950); *Yakus v. United States,* 321 U.S. 414, 442–43, 64 S.Ct. 660, 675–76, 88 L.Ed. 834 (1944); *North American Cold Storage Co. v. City of Chicago,* 211 U.S. 306, 315–21, 29 S.Ct. 101, 104–06, 53 L.Ed. 195 (1908). Breaching a dam so as to avoid the risk of disastrous flooding falls neatly into this "emergency action" category.

Plaintiffs contend that defendants are not entitled to rely on the emergency action defense because there was *in fact* no emergency, as should have been apparent from the fact that the lake was virtually empty when the dam was breached. Although there was no emergency at the time the dam was breached, states are given "great leeway in adopting summary procedures to protect public health and safety," even in the absence of an emergency in the usual sense. *Mackey v. Montrym,* 443 U.S. 1, 17, 99 S.Ct. 2612, 2620, 61 L.Ed.2d 321 (1979) (summary suspension of drivers refusing to take breath-analysis test). Because government officials need to act promptly and decisively when they perceive an emergency, no predeprivation process is due. *See Virginia Surface Mining,* 452 U.S. at 302–03, 101 S.Ct. at 2373–74; *North*

*American,* 211 U.S. at 319–20, 29 S.Ct. at 105–06.

Notwithstanding the deference accorded to officials exercising summary powers to protect the public, their power to declare an emergency and thus eliminate the constraints of the due process clause is not without bounds. *See, e.g., Virginia Surface Mining,* 452 U.S. at 302 n. 46, 101 S.Ct. at 237 n. 46 (due process violations might arise if "a pattern of abuse and arbitrary action were discernible from review of an agency's administration of a summary procedure"). The rationale for permitting government officials to act summarily in emergency situations does not apply where the officials know no emergency exists, or where they act with reckless disregard of the actual circumstances. *Cf. New York Times Co. v. Sullivan,* 376 U.S. 254, 279–83, 84 S.Ct. 710, 725–27, 11 L.Ed.2d 686 (1964) (need to avoid chilling effect on protected expression is satisfied by imposition of "actual malice" standard in libel cases involving public figures).

As already noted, plaintiffs alleged that by March 8 the emergency was over. Yet, at the direction of the DSOD, workers began lowering the spillway on March 10; and on March 11 the dam was breached and the lake destroyed. Accepting plaintiffs' allegations as true—as we must on this review from the grant of a motion on the pleadings—there would seem to have been no justification for the DSOD's failure to give plaintiffs notice and an opportunity for a hearing, however abbreviated. Plaintiffs have therefore stated a claim for denial of procedural due process.[7]

---

**7.** Defendants argue that plaintiffs were not denied procedural due process because plaintiffs had an informal hearing before a judge of the Superior Court in attempting to obtain a temporary restraining order. If the facts are as plaintiffs allege, the rushed, off-the-record proceeding in which they participated does not satisfy due process under these circumstances. Due process requires notice and a hearing "at a meaningful time and in a meaningful manner." *Armstrong,* 380 U.S. at 552, 85 S.Ct. at 1191. Plaintiffs allege that DSOD officials did not tell them about the decision to breach until just hours before the event, although DSOD had made the decision much earlier. Also, they

allege there was no emergency, so the breach could have been safely postponed to give plaintiffs an opportunity to avail themselves of state court processes.

At the hearing that afternoon, the judge refused to grant a TRO because plaintiffs did not produce an engineering study or testimony from an engineer showing that the dam was safe. Thus, as a result of alleged DSOD misbehavior, plaintiffs were unprepared to defend their rights in court. This is not due process. A few hours notice is as good as no notice at all when a meaningful court hearing requires plaintiffs to produce highly technical evidence.

### III

Plaintiffs next assert that, in breaching the dam, defendants violated their rights to substantive due process. We have recognized that the due process clause includes a substantive component which guards against arbitrary and capricious government action, even when the decision to take that action is made through procedures that are in themselves constitutionally adequate. *See Smith v. City of Fontana*, 818 F.2d 1411 (9th Cir.), *cert. denied*, 484 U.S. 935, 108 S.Ct. 311, 98 L.Ed.2d 269 (1987). Defendants argue that plaintiffs' substantive due process claim is barred by *Williamson County* and *Parratt*. Neither case is on point.[8] We have previously held that "substantive due process is violated at the moment the harm occurs [and therefore] the existence of a postdeprivation state remedy should not have any bearing on whether a cause of action exists under § 1983." *Rutherford v. City of Berkeley*, 780 F.2d 1444, 1447 (9th Cir.1986). Thus, *Parratt* is inapplicable to such claims, *see Smith v. City of Fontana*, 818 F.2d at 1414–15, as is the second ripeness prong of *Williamson County* (requiring exhaustion of state procedures for obtaining compensation). Moreover, the first ripeness prong of *Williamson County* (requirement of final decision), while applicable to most substantive due process claims arising out of alleged regulatory takings, *see Shelter Creek*, 838 F.2d at 379; *Kinzli*, 818 F.2d at 1456; *Norco Construction*, 801 F.2d at 1145, is not relevant to a physical taking claim because there are no administrative avenues of relief to exhaust: the taking itself firmly establishes the extent of the deprivation.

Defendants argue that special ripeness requirements nonetheless apply when substantive due process claims arise out of fact situations that also give rise to taking claims. They rely on *Lake Nacimiento Ranch Co. v. County of San Luis Obispo*, 841 F.2d 872 (9th Cir.1987), *cert. denied*,

—— U.S. ——, 109 S.Ct. 79, 102 L.Ed.2d 55 (1988), and *Cassettari v. County of Nevada*, 824 F.2d 735 (9th Cir.1987).

We do not agree. In *Lake Nacimiento* we held that *Parratt* barred what plaintiffs styled a substantive due process claim but was in fact a procedural due process claim involving "an attack on the decision-making process itself." 841 F.2d at 879. Plaintiffs here are challenging the defendants' decision, not merely the process by which it was reached. *Lake Nacimiento* is not controlling.

*Cassettari* is even less on point. That case limits its discussion of ripeness to fifth amendment taking claims. Indeed, in explaining why Cassettari's taking claim was unripe, we distinguished cases involving claims based on substantive due process and the fourth amendment. We observed that in those cases, in contrast to taking cases, "the deprivation of a federal right occurs regardless of the availability of a state remedy." 824 F.2d at 739. Neither *Cassettari* nor *Lake Nacimiento* speaks to a true substantive due process claim.

Because we conclude that plaintiffs' substantive due process claim is ripe, we must next consider whether plaintiffs have stated a claim for relief. *See Alcaraz v. Block*, 746 F.2d 593, 602 (9th Cir.1984) (court of appeals must affirm district court's grant of summary judgment if correct, even if reached for wrong reason). To establish a violation of substantive due process, the plaintiffs must prove that the government's action was "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303 (1926); *see Moore v. City of East Cleveland*, 431 U.S. 494, 498 n. 6, 97 S.Ct. 1932, 1934–35 n. 6, 52 L.Ed.2d 531 (1977) (plurality opinion); *id.* at 514, 97 S.Ct. at 1943 (Stevens, J., concurring in the judgment); *Nectow v.*

---

**8.** Nor is the emergency action exception to the normal requirement of predeprivation process, *see* p. 1405 *supra*, relevant in this context. *Virginia Surface Mining, North American* et al., considered whether some form of hearing is required before the government acts in emergency situations. This inquiry is unrelated to the separate question of whether the government's action violated substantive constitutional constraints, even though the government's decision was reached in a procedurally correct manner.

*City of Cambridge,* 277 U.S. 183, 187–88, 48 S.Ct. 447, 448, 72 L.Ed. 842 (1928).

■■ Plaintiffs allege that the decision to breach the dam was originally made on March 4, 1983, and reaffirmed on March 10. Not only were these decisions kept secret without any legitimate reason, DSOD officials deceived plaintiffs with assurances that the dam would *not* be breached. Indeed, DSOD allegedly returned control of the lake to the plaintiffs at one point, promising to maintain the water level. In addition, plaintiffs allege that defendants well knew that the emergency was over by March 8, three days before defendants actually breached the dam. Plaintiffs thus claim that defendants breached the dam when they knew, or should well have been aware, that such an action was unjustified, and that they shrouded their decision in a veil of secrecy and deception wholly unjustified by the situation.[9]

A government entity's police and eminent domain powers go far beyond crisis management; the city certainly has the power to protect its citizens by breaching a dam it considers potentially, though perhaps not imminently, dangerous. But government power is a double-edged sword; if wielded in an abusive, irrational or malicious fashion it can cause grave harm. *See Silverman v. Barry,* 845 F.2d 1072, 1080 (D.C.Cir.) ("[t]o succeed in a § 1983 suit for damages for a substantive due process ... violation, a plaintiff must at least show that state officials are guilty of grave unfairness in the discharge of their legal responsibilities"), *cert. denied,* —— U.S. ——, 109 S.Ct. 394, 102 L.Ed.2d 383 (1988); *Bello v. Walker,* 840 F.2d 1124, 1129 (3rd Cir.) ("deliberate and arbitrary abuse of government power violates an individual's right to substantive due process"), *cert. denied,* —— U.S. ——, 109 S.Ct. 134, 102 L.Ed.2d 107 (1988).

Our cases recognize that the due process clause places a substantive, as well as a procedural, limitation on the exercise of governmental power. In *Vaughan v. Ricketts,* 859 F.2d 736, 738 (9th Cir.1988), for example, we considered the immunity from suit of a prison warden for digital rectal searches conducted by prison guards. The question of immunity, in turn, hinged on the warden's knowledge that the searches violated the Constitution. Digital rectal searches are clearly justified under certain circumstances. *See, e.g., United States v. Velasquez,* 469 F.2d 264 (9th Cir.1972), *cert. denied,* 410 U.S. 945, 93 S.Ct. 1399, 35 L.Ed.2d 612 (1973); *Rivas v. United States,* 368 F.2d 703 (9th Cir.1966), *cert. denied,* 386 U.S. 945, 87 S.Ct. 980, 17 L.Ed.2d 875 (1967). In *Vaughan,* however, the prisoners claimed that the searches were conducted " 'maliciously and sadistically ... for the purpose of causing harm,' " and accompanied by "joking and insults directed at the inmates...." 859 F.2d at 742. We concluded that the warden should well have known that the searches conducted in that fashion violated the prisoners' substantive due process rights.

We reached a similar conclusion in *Rutherford v. City of Berkeley,* 780 F.2d 1444, 1446 (9th Cir.1986), and *Meredith v. Arizona,* 523 F.2d 481, 484 (9th Cir.1975). In these cases, defendant police officers and prison guards were accused of unjustified brutality against suspects and prisoners. Government officials are, of course, justified in using force—even deadly force—in carrying out legitimate governmental functions. But, when the force is excessive, or used without justification or for malicious reasons, there is a violation of substantive due process.[10]

Police and prison guard brutality are among the most egregious abuses of governmental power. But the fourteenth

---

**9.** To the extent factual allegations made by plaintiffs are not entirely reflected in the complaint, plaintiffs can request leave to amend on remand. *See* Fed.R.Civ.P. 15(a); *United States v. Webb,* 655 F.2d 977, 979 (9th Cir.1981).

**10.** In *Graham v. Connor,* —— U.S. ——, 109 S.Ct. 1865, 1870–71, 104 L.Ed.2d 443 (1989), the Supreme Court held that a claim of abusive gov-

ernmental conduct that implicates a specific constitutional right must be analyzed as a violation of that right, rather than as a violation of substantive due process. As a result, cases like *Rutherford, Vaughan* and *Meredith* would today be treated as fourth and eighth amendment challenges. *Graham* does not, however, bar substantive due process analysis altogether. A

amendment's due process clause protects property no less than life and liberty. U.S. Const. amend. XIV, § 1 ("[n]o State shall ... deprive any person of life, liberty, or property, without due process of law"). To the extent that arbitrary or malicious use of physical force violates substantive due process, there is no principled basis for exempting the arbitrary or malicious use of other governmental powers from similar constitutional constraints.[11] Justice Harlan expressed this view eloquently in *Poe v. Ullman,* 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961):

> [T]he full scope of the liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees elsewhere provided in the Constitution. This "liberty" is not a series of isolated points pricked out in terms of the taking of property; the freedom of speech, press, and religion; the right to keep and bear arms; the freedom from unreasonable searches and seizures; and so on. It is a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints....

*Id.* at 543, 81 S.Ct. at 1776–77, (Harlan, J., dissenting), *quoted with approval in Moore v. City of East Cleveland,* 431 U.S. at 502, 97 S.Ct. at 1937 (plurality opinion). As Justice Brennan aptly noted, "if a policeman must know the Constitution, then why not a planner?" *San Diego Gas & Electric Co. v. City of San Diego,* 450 U.S. 621, 661 n. 26, 101 S.Ct. 1287, 1309 n. 26, 67 L.Ed.2d 551 (1981) (Brennan, J., dissenting).[12]

■ In determining whether substantive due process rights have been violated, we will look to such factors as the need for the governmental action in question, the relationship between the need and the action, the extent of harm inflicted, and whether the action was taken in good faith or for the purpose of causing harm. *See Rutherford,* 780 F.2d at 1446; *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973).[13] To be sure, governmental entities must have much latitude in carrying out their police power responsibilities; mere errors of judgment, or actions that are mistaken or misguided, do not violate due process. But malicious, irrational and plainly arbitrary actions are not within the legitimate purview of the state's power. *See Moore,* 431 U.S. at 520–21, 97 S.Ct. at 1946 (Stevens, J., concurring) (ordinance not shown to have substantial rela-

---

plaintiff may still state a claim for violation of substantive due process where it is alleged that the government has used its power in an abusive, irrational or malicious way in a setting not encompassed by some other enumerated right. To that extent, our analysis in *Rutherford, Vaughan* and *Meredith* remains viable.

**11.** As noted by Professor Norman Karlin, the freedoms granted by the bill of rights were cut from a single constitutional cloth:

> Rights were owned by the people, as individuals, and never dichotomized into personal and property. It was to the contrary. The principle established by the Magna Carta and thus basic to the common law and later to the Constitution was the identification of liberty and property. Ownership of property was evidence of liberty. In solemn ceremony, it was there decreed that neither the King nor government could take property except *per legem terrae.* The reach was not procedural but substantive. Coke in his writings used the phrase interchangeably with "due process of law;" and, in this form, the concept was included in the fifth amendment of the United States Constitution. Life, liberty and property comprised an invulnerable trilogy....

Karlin, *Back to the Future: From* Nollan *to* Lochner, 17 Sw.U.L.Rev. 627, 637–38 (footnotes omitted). *See also* Pilon, *Legislative Activism, Judicial Activism, and the Decline of Private Sovereignty,* in Economic Liberties and the Judiciary 183, 200 (J. Dorn & H. Manne eds. 1987).

**12.** Although Justice Brennan (speaking for four Justices) dissented on procedural grounds, his substantive views apparently enjoyed the support of a majority of the Court. *See San Diego Gas & Electric Co. v. City of San Diego,* 450 U.S. 621 at 633–34, 101 S.Ct. 1287, 1294–95, 67 L.Ed.2d 551 (1981) (Rehnquist, J., concurring) ("If I were satisfied [that the jurisdictional requirements had been met], I would have little difficulty in agreeing with much of what is said in the dissenting opinion of Justice Brennan.").

**13.** In *Graham,* 109 S.Ct. at 1869–71, the Court disapproved use of the *Johnson v. Glick* four-part test where the governmental conduct violates only a more specific constitutional guarantee. The test may still be applied, however, where, as here, the plaintiff alleges governmental abuse not covered by another constitutional standard.

tion to public health, safety or morals, which cuts deeply into fundamental rights normally associated with ownership of residential property, violates substantive due process).

The exercise of emergency powers is particularly subject to abuse. Emergency decision-making is, by its nature, abbreviated; it normally does not admit participation by, or input from, those affected; judicial review, as this case illustrates, is often greatly curtailed or non-existent. Exigent circumstances often prompt actions that severely undermine the rights of citizens, actions that might be eschewed after more careful reflection or with the benefit of safeguards that normally constrain governmental action. *See generally* Karlin, 17 Sw.U.L.Rev. at 653–57. Whether government officials invoked emergency powers when they knew, or well should have known, that no exigency justified use of such draconian measures, is therefore highly relevant in determining whether the government has violated the plaintiff's substantive due process rights.

We conclude that plaintiffs have stated a claim for a violation of substantive due process. Construed in the light most favorable to them, their allegations paint a picture of government officials bent on destroying the dam for no legitimate reason, and determined to conceal that decision until the last possible moment to prevent plaintiffs from taking advantage of available legal processes.[14] This claim goes beyond the taking of plaintiffs' property; plaintiffs also claim that government officials abused the legitimate police powers entrusted to them.[15] While defendants dispute these charges, that dispute cannot be resolved on a motion for judgment on the pleadings.

## IV

■ Finally, plaintiffs allege that they were deprived of their right "to be secure in their persons, houses, papers, and effects, against unreasonable ... seizures," in violation of the fourth amendment. U.S. Const. amend. IV. Defendants once again respond that plaintiffs' claim is not ripe.[16] They point to *Cassettari v. County of Nevada*, 824 F.2d 735 (9th Cir.1987), where we rejected a taking claim purportedly based on the fourth amendment.

We agree that plaintiffs' claim is precluded by *Cassettari*, where we stated:

*Coniston Corp. v. Village of Hoffman Estates,* 844 F.2d 461, 468 (7th Cir.1988).

14. Although plaintiffs' allegations that the defendants failed to conduct statutorily required engineering studies or to inform them of their decision to breach the dam form the basis of their procedural due process claim, these allegations are also relevant to their substantive due process claim; indeed, it is almost inevitable that there will be some overlap between the allegations supporting both claims. As Judge Posner recently noted:

the line between "procedure" and "substance" is hazy in the setting of the regulation of land uses. The denial of the plaintiffs' site plan without a full statement of reasons is what gives the denial such arbitrary cast as it may have, and thus lends color to the claim of irrationality, which is the substantive due process claim; but the failure to give reasons is also the cornerstone of the procedural due process claim. It is no good saying that if a person is deprived of property for a bad reason it violates substantive due process and if for no reason it violates procedural due process. Unless the bad reason is invidious or irrational, the deprivation is constitutional; and the no-reason case will sometimes be a case of invidious or irrational deprivation, too, depending on the motives and consequences of the challenged action.

15. Plaintiffs allege that, among other things, DSOD officials intentionally delayed telling them about the decision to breach the dam until just hours before the breach occurred. This was designed, plaintiffs claim, to prevent them from seeking the legal protection to which they were entitled. Again, it is no defense to this charge that plaintiffs had a hearing on the afternoon the dam was breached. Taking the facts as plaintiffs allege them, the hearing was meaningless, as plaintiffs had inadequate time to prepare; it cannot rebut the charge that DSOD officials deliberately attempted to prevent plaintiffs from resorting to available legal processes.

16. They also claim that *Parratt* and the emergency seizure cases, discussed p. 1408 *supra*, foreclose this claim. As we indicated above, however, *Parratt* is limited to procedural due process claims; it has no relevance in the context of a fourth amendment claim. *See Robins v. Harum*, 773 F.2d 1004, 1009 (9th Cir.1985); *accord Wolf–Lillie v. Sonquist*, 699 F.2d 864, 870–72 (7th Cir.1983). Similarly, the emergency seizure cases apply only to procedural due process claims. *See* note 8 *supra*.

Cassettari also argues that when the County took his property without paying him for it, the County violated his fourth amendment right to be secure against unreasonable seizures. This argument is without merit. A claim for the taking by a state of private property for public use without just compensation is properly asserted under the fifth and fourteenth amendments.

*Id.* at 740 n. 7. The claim plaintiffs alleged under the fourth amendment is, in fact, a taking claim which is properly asserted under the fifth amendment. The claim is unripe under *Williamson County*, 473 U.S. at 200, 105 S.Ct. at 3123.

### Conclusion

The district court's judgment as to the taking and fourth amendment claims are affirmed; the judgment as to the procedural and substantive due process claims are reversed. We remand for further proceedings consistent with this opinion.