FLEMING, J.
Whiting appeals from a summary judgment which dismissed his complaint to quiet title and declared valid a special assessment lien of the City of Pasadena against his property.
In February 1965 Whiting purchased a lot in Pasadena at a trustee’s sale. In October 1965 the city notified him that a special assessment of $947 was due on the lot, a sum which represented the cost of demolishing a house on the lot in 1964 in proceedings under Pasadena Ordinance No. 4590. Whiting filed suit in the superior court to quiet title, asking *370 that the City of Pasadena be barred from asserting its lien against the property because of its failure to record the order for demolition as required by the ordinance. Both parties moved for summary judgment, and the motion of the city was granted.
In demolishing the house the City of Pasadena acted under a 1962 ordinance which adopted with certain modifications the 1961 Edition of the Uniform Housing Code of the International Conference of Building Officials. The stated goals of the ordinance were to prevent the spread of substandard housing and to eliminate blight. The ordinance declared that buildings found to be substandard within the definition of the Code were public nuisances, and set out procedures for their abatement. Section 5(a) read: “(a) The Enforcement Officer shall examine . . . every building . . . reported to be substandard and if such is found to be a substandard building . . . shall give to the owner . . . written notice stating the defects thereof . . . Designated period within which said owner or person in charge is required to comply with the order . . . shall begin as of the date of receipt of such notice. Enforcement Officer may also file with the office of the County Recorder ... a certificate that the building described is a substandard building. Upon correction of such deficiencies . . . the Enforcement officer shall file a certificate with the County Recorder . . . that the said building is no longer a substandard building.” Section 6 created a Housing Advisory and Appeals Board and provided: “(B)(1)(b) The [Housing] Board shall conduct a hearing on any proposed demolition.” Section 6(B)(7) declared: “A copy of the order to vacate, repair, rehabilitate, or demolish and remove any structure shall be posted at the entrance to the building, and shall be served . . . upon all persons to whom the notice of hearing is required to be served. A copy shall be recorded in the office of the County Recorder. ’ ’
If an order of the housing board or the enforcement officer has not been complied with, section 6(C) states: “(1) The Board of Directors . . . may order the Enforcement Officer to proceed with the work specified in such order. A statement of the cost . . . shall be transmitted to the Board of Directors who shall cause the same to be paid and levied as a special assessment against the property. (2) ... costs shall be charged to the owner of the premises involved as a special assessment on the land on which the building or structure is located and shall be collected in the planner pro* yjded for special assessments, ’ ’
*371 Prior to November 1963 the enforcement officer determined that the house on what is now Whiting’s lot was substandard, and a date for a hearing on demolition was set. The then record owner, James MeRiley, was served in November 1963 with notice of the hearing but did not appear, and the Housing Board ordered him to demolish the house. This order was personally served on MeRiley in January 1964 and posted on his property, but it was not recorded in the county recorder’s office. MeRiley apparently took no steps to demolish the house, and the city then contracted for its demolition in September 1964. Notice of completion of the demolition was recorded with the county recorder on December 1, 1964, and on the same date the city assessor made a first notation on the assessment roll of a special assessment against the property for the cost of demolition. On January 4, 1965, this amount was entered on the 1965-66 roll as a final entry. Whiting bought the lot on February 11, 1965, from the holder of a defaulted note and deed of trust executed by MeRiley.
Because the order for demolition had not been recorded, Whiting contends the demolition and the assessment for its cost were illegal.
We agree with Whiting that the ordinance required the City to record the order of demolition. Section 6(B) (1) (b) explicitly requires the housing board to hold a hearing on any proposed demolition. Section 6(B)(7) requires recordation of orders of the housing board issued after a hearing. Since there was a hearing and an order issued by the board, it should have been recorded. While there is authority under section 5(a) for the enforcement officer to order “required repairs or improvements, rehabilitation, or demolition and removal” within 48 hours,[1] and while orders issued pursuant to section 5 may but need not be recorded, in this case the housing board itself ordered the demolition, and recordation became mandatory.
What are the consequences of the failure to record the order? The house was demolished as a public nuisance, and before a city can abate a public nuisance on private property, due process of law must be afforded the owner of the property. This includes notice and an opportunity to be heard. (Thain v. City of Palo Alto, 207 Cal.App.2d 173, *372 189 [24 Cal.Rptr. 515].) But as we have seen, McRiley, the owner, received notice of the finding that his building was substandard, notice of the hearing at which the housing board determined it to be a nuisance, and notice of the order to abate. He was thus afforded the due process of law to which he was entitled, and the failure to record the housing board’s order was not a ground on which he could have challenged the legality of the demolition. The actual demolition, therefore, was lawful, and since Whiting does not challenge the procedure by which the cost of demolition was assessed against the property,[2] we turn to the second part of his argument.
Whiting argues that one of the purposes of section 6(B)(7) is to give prospective purchasers notice of orders for demolition and that as a prospective purchaser of this property he was entitled to such notice. Therefore, he concludes, although the assessment may have been valid against McRiley, it cannot be asserted against the property after its transfer to him.
Assuming that a purpose of recordation is to give notice to prospective purchasers of orders of demolition, recordation of the order would merely have given notice that a house on the property had been ordered demolished. It would not have given notice that the cost of demolition was to be assessed against the property. Such notice would not have been possible at the time of recordation of the demolition order, for McRiley might have demolished the house himself and forestalled the assessment of any lien. Even with the benefit of notice of an order for demolition a prospective purchaser would still be required to determine whether there had been a subsequent assessment against the property and whether that assessment had been paid.
But notice of completion of demolition had been properly recorded in the recorder’s office two months before Whiting *373 purchased the lot. This notice warned of the possibility of an assessment against the property for the cost of demolition in the same fashion that recordation of the earlier order for demolition would have done. This notice told a prospective purchaser that a substandard house had stood on the property and had been demolished. And since the property was foreclosed on default, it suggested that the city might have demolished the house and assessed a charge against the property on the owner’s failure to pay for the demolition. In point of fact this notice provided as good a clue to the possibility of a special assessment on the city rolls as would have notice of the earlier order, which only concerned prospective, not completed, action. To fully protect his interest the prospective buyer should have examined the city’s assessment rolls, for except for the sold-out owner in default, the city was the only potential demolisher, and the city was not likely to have demolished the house free of charge.
We conclude that failure to record the order of demolition does not affect the validity of the special assessment for the cost of demolition by the City. (Miller v. County of Kern, 137 Cal. 516, 524 [70 P. 549].)
The judgment is affirmed.
Roth, P. J., and Herndon, J., concurred.

The reference to demolition in section 5 should probably be read in the light of section 6(B) (4) (f), which states “An order to repair may be satisfied by demolition. ’ ’

An affidavit submitted by the Pasadena City Assessor, Tax and License Collector describes the procedure used.
On December 1, 1964, the assessor received a copy of the city controller’s invoice for the costs of demolition. The amount was entered as a pencil notation against the property on the 1964-65 Assessment Roll.
On December 22, the city controller advised the assessor that the amount was correct, and that McRiley had not paid it.
On January 4, 1965, the amount was entered as an ink notation on the 1965-66 Assessment Roll.
The Assessment Roll was open at all times to public inspection as required by statute. (Rev. & Tax. Code, § 408.) Taxes on the property become liens on the property on a eertaain date each year, normally the first Monday in March, although provision may be made for another lien date. (Rev. & Tax. Code, § 2192.)