Filed 11/1/13  GCP Management v. City of Oakland CA1/4

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| GCP MANAGEMENT, LLC et al.,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>CITY OF OAKLAND et al.,<br><br>        Defendant and Respondent. | A135871<br><br>(Alameda County<br>Super. Ct. No. RG10538368) |

GCP Management, LLC, as agent for GCP, Gibraltar Capitol Fund, VI, LLC (GCP), appeals the summary adjudication of its action for inverse condemnation as well as the subsequent grant of a nonsuit with respect to its claim of trespass.  In addition, GCP contends that the trial court's ruling in favor of the City of Oakland (City) on the City's cross-complaint for damages was error.  We affirm.

## I.  BACKGROUND

### A.    *The City's Abatement Proceedings[1]*

GCP is the owner of real property located at 601 MacArthur Boulevard, 620 Wesley Avenue, and 620 Hillgirt Circle in the City (collectively, the Property).

---

[1] Other than in connection with our consideration of the City's cross-complaint for damages, we adopt the facts set forth in this opinion from the supporting papers filed by both parties in connection with the City's motion for summary adjudication of GCP's inverse condemnation claim.  Although GCP interposed numerous blanket objections with respect to the majority of the City's material facts, the trial court overruled all of these objections, and we see no abuse of discretion in that decision.  (See *People ex rel. Lockyer v. Sun Pacific Farming Co.* (2000) 77 Cal.App.4th 619, 639-640.)

Substandard conditions on the Property have been of concern to the City for a number of years. In July 2006, pursuant to its local nuisance ordinance, the City sent a letter to a prior owner declaring the Property to be a public nuisance due to a number of deteriorating conditions, including the fact that the temporary shoring in place on a partially-excavated slope was "not designed for long-term restraint of the hillside" (2006 Declaration). Deeming the Property dangerous to workers, visitors and abutting dwellings, the City ordered the owner to fix the objectionable conditions on the Property within a specified timeframe. Failure to comply with the City's demands would result in a number of negative consequences, including the City "re-accessing your property without further notice and for additional charge" to remediate the problem.

By October 2008, the Property—which was in the process of being sold—had not been rehabilitated. At that time, both the current owner and the purchaser entered into a Compliance Plan and Rehabilitation Schedule Work Plan with the City (Compliance Plan) pursuant to which they agreed, among other things, to install "an approved shoring system for the length of the slope of the properties." The Compliance Plan expressly acknowledged that the 2006 Declaration was to remain in effect while the necessary work was being done. In addition, the Compliance Plan required the owner or new buyer to post a $250,000 performance bond to secure the "faithful completion" of its requirements. GCP—the appellant herein—supplied this $250,000 bond, which was to be returned directly to the appellant upon successful completion of the work. Repayment of the GCP loan was secured by a deed of trust recorded against the Property on October 15, 2008.

In March 2010, the City notified the then-owner of the Property that it had failed to comply with the terms of the Compliance Plan and that the Property remained "a longstanding blight and continuing hazard for the neighborhood." In February, an exposed City sewer pipe on the Property had broken during a winter storm requiring a City maintenance crew to provide a temporary repair for the "inadequately supported pipe" and to pump raw sewage off the Property. Moreover, the same winter storm caused the stability of the hillside on the Property to deteriorate. Specifically, the City noted that

2

"[t]he temporary shoring and winterization for the hillside has been ineffective in retaining the sloughing soil."

The City retained Ninyo & Moore, a geotechnical engineering firm, to aid in its analysis of the Property. It was Ninyo & Moore's opinion in early 2010 that "erosion and sloughing of soils from the steep, partially protected slope" on the Property would continue "if the slope [was] not protected." The firm further opined that the "erosion and sloughing" would "likely lead to larger failure of the slope." In a March 2010 letter to the owners of the Property, the City indicated that it would be contracting with third-parties to complete the sewer extension for the Property and to install a hillside stabilization system. Given the owner's default under the terms of the Compliance Plan, the City stated that it would be using the monies from the owner's forfeited performance bond to defray its costs.

An additional inspection by the City on April 27, 2010, confirmed the continuing deterioration of conditions on the Property. On April 29, 2010, the City recorded a certificate memorializing its 2006 Declaration against the Property. Then, on May 11, 2010—noting that the dangerous conditions previously identified in the 2006 Declaration were "endangering upslope properties to the extent that these conditions have become manifestly unsafe for the public and imminently hazardous for occupants and visitors"— the City notified the owner of the Property that it was declaring the Property to be an imminent hazard pursuant to the provisions of its local nuisance ordinance (Imminent Hazard). The City detailed specific abatement work required to be completed by June 1, 2010, and informed the owner that it had until May 18, 2010, to appeal the City's determination. If the owner failed to either successfully appeal or complete the required work by the stated deadline, the City indicated that it would enter the Property "without further notice to perform the mitigation work." All costs associated with this work would be charged against the Property and the owner. There is no indication in the record that an appeal was filed, or that any abatement work was done in response to this declaration of Imminent Hazard. Thereafter, on June 9, 2010, GCP became the record owner of the Property through foreclosure on its deed of trust.

3

Representatives of GCP met with City officials on August 25, 2010, to discuss the contemplated work on the Property. At that meeting, the City agreed to allow GCP an opportunity to assess the situation and to submit its own proposal, but indicated that work would need to begin in early September to assure its completion before winter. As of September 8, 2010, the City had not received a proposal or any permit applications from GCP. It therefore notified GCP that it intended to move forward with the planned abatement work on September 13. On September 27, 2010, GCP filed an Ex Parte Application for Temporary Restraining Order and Order to Show Cause re: Preliminary Injunction in Alameda County Superior Court (TRO), alleging that the City had entered the Property without permission and was destroying improvements on the Property. GCP sought an order stopping the City's demolition activity and requiring the City to give GCP a "meaningful opportunity to respond" to the City's concerns about the site. The TRO application was denied that same day after hearing, and the City subsequently completed the abatement work on the Property, stabilizing the hillside.

**B.** *Proceedings in the Trial Court*

On the same day that it filed its TRO application, GCP also filed a complaint in Alameda County Superior Court asserting causes of action against the City for inverse condemnation and trespass based on the City's abatement activities with respect to the Property. GCP sought damages as well as injunctive and declaratory relief. A Second Amended Complaint filed in April 2011 added a cause of action for negligence. In May 2011, the City filed a cross-complaint seeking damages based on its unreimbursed abatement costs with respect to the Property.

The City filed a motion for summary adjudication of GCP's inverse condemnation claim in November 2011. On February 17, 2012, the trial court overruled all of GCP's evidentiary objections with respect to the requested summary adjudication and granted the City's motion. Subsequently, on March 8, 2012, GCP dismissed its negligence cause of action, and proceeded to trial before the court on its action for trespass. At the conclusion of GCP's opening statement and after an offer of proof, the City moved for a

4

judgment of nonsuit pursuant to Code of Civil Procedure section 581c, subdivision (a). The trial court granted the City's motion.

A bench trial then commenced with respect to the City's cross-complaint for damages. At the conclusion of the bench trial, the trial court awarded damages to the City in the amount of $310,315.18. Judgment against GCP on its action for trespass was entered on May 3, 2012. On that same date, the trial court issued its Statement of Decision and (Proposed) Judgment in favor of the City on its cross-complaint for damages. Final Judgment with respect to the City's cross-complaint was entered on May 18, 2012.[2] A timely notice of appeal filed July 2, 2012, brought the case before this Court.

## II. SUMMARY ADJUDICATION PROCEEDINGS

We turn first to GCP's contention that the trial court erred in granting the City's motion for summary adjudication of GCP's inverse condemnation claim. The trial court granted the summary adjudication motion by order dated February 17, 2012, finding that the City's abatement activity on the Property was a valid exercise of its police power, that GCP was on notice of the need for immediate remediation of the Property, and that the City's actions did not cause GCP to suffer any damage. GCP argues that the Court's

---

[2] Although the record does not reflect that judgment was ever entered with respect to appellant's inverse condemnation claim, we note that, on appeal from a superior court judgment, "the reviewing court may review the verdict or decision and *any intermediate ruling, proceeding, order or decision which involves the merits or necessarily affects the judgment or order appealed from or which substantially affects the rights of a party . . . .*" (Code of Civ. Proc., § 906 [italics added]; see also *Jennings v. Marralle* (1994) 8 Cal.4th 121, 128 ["an order . . . granting summary adjudication of certain claims . . . is generally reviewable on appeal from the final judgment in the action"].) Here, the trial court's summary adjudication of GCP's inverse condemnation claim clearly substantially affected both the court's judgment on GCP's trespass claim as well as its judgment on the City's cross-complaint for damages. We therefore review the merits of all three decisions.

summary adjudication order was improper because issues of material fact existed with respect to each of these three findings.[3]

## A.    *Statutory Framework and Standard of Review*

The standards for granting summary adjudication are well-settled and easily delineated.  A trial court must grant a motion for summary adjudication "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  (Code Civ. Proc., § 437c, subd. (c); see also *id.*, subd. (f)(2) [motion for summary adjudication "shall proceed in all procedural respects as a motion for summary judgment"].)  Summary adjudication in favor of a defendant such as the City is proper if (1) the defendant shows that one or more of the elements of a cause of action cannot be established or that there is a complete defense to it; and (2) the plaintiff fails to meet his or her burden of showing the existence of a triable issue of material fact.  (*Id.*, subd. (p)(2).)  A triable issue of material fact cannot be raised through speculation or conclusory assertions.  (*Lyons v. Security Pacific Nat. Bank* (1995) 40 Cal.App.4th 1001, 1014 (*Lyons)*.)  Thus, the plaintiff cannot rely upon "the mere allegations or denials of its pleadings," but must instead set forth the "specific facts" supporting the existence of the material fact.  (Code Civ. Proc., § 437c, subd. (p)(2).)

---

[3] GCP also argues that the trial court's summary adjudication order runs afoul of subdivision (g) of Code of Civil Procedure section 437c, which provides in relevant part: "Upon the grant of a motion for summary judgment, on the ground that there is no triable issue of material fact, the court shall, by written or oral order, specify the reasons for its determination.  The order shall specifically refer to the evidence proffered in support of, and if applicable in opposition to, the motion which indicates that no triable issue exists. The court shall also state its reasons for any other determination."  Although we agree with the trial court that its ruling was "minimal," its order did specify the reasons for its determinations and reference relevant evidence.  Under such circumstances, we find that it was adequate for purposes of subdivision (g).  Moreover, "even assuming that, ideally, a further statement ought to have been given, there is no harm where, as here, our independent review establishes the validity of the judgment."  (*Goldrich v. Natural Y Surgical Specialties, Inc.* (1994) 25 Cal.App.4th 772, 782.)

6

On appeal, we undertake de novo review of the trial court's decision to grant summary adjudication, "considering all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports." (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476.) We are not bound by the trial court's stated reasons or rationales. (*Horn v. Cushman & Wakefield Western, Inc.* (1999) 72 Cal.App.4th 798, 805.) Rather, we engage anew in " 'the same three-step analysis required of the trial court.' " (*Lyons, supra,* 40 Cal.App.4th at p. 1012.) First, we " ' "identify the issues framed by the pleadings since it is these allegations to which the motion must respond." ' " (*Ibid.*) Next, we " ' "determine whether the moving party's showing has established facts which negate the opponent's claim and justify a judgment in movant's favor." ' " (*Ibid.*) Finally—if the moving party has made an initial showing justifying summary adjudication—we " ' "determine whether the opposition demonstrates the existence of a triable, material factual issue." ' " (*Ibid.*)

In the present case, the City moved for and was granted summary adjudication of GCP's claim of inverse condemnation. The City argues that summary adjudication was proper because its actions with respect to the Property were a valid exercise of its police power. The City also asserts that it is entitled to summary adjudication because GCP has not shown that the Property has suffered any actual damage as a result of the City's abatement activity. Since we conclude that the City has established that its actions constituted a valid exercise of its police power—and thus the trial court's summary adjudication of the matter was appropriate—we do not reach the issue of actual damage to the Property.

**B.**    ***General Principles Governing Inverse Condemnation and the Police Power***

"Inverse condemnation, like eminent domain, 'rest[s] on the constitutional requirement that the government must provide just compensation to a property owner when it takes his or her private property for a public use.' " (*City of Los Angeles v. Superior Court* (2011) 194 Cal.App.4th 210, 220 (*Los Angeles*), quoting *Beaty v. Imperial Irrigation Dist.* (1986) 186 Cal.App.3d 897, 902 (*Beaty*); see also Cal. Const.,

art. I, § 19.) "To state a cause of action for inverse condemnation, the property owner must show there was an invasion or appropriation (a 'taking' or 'damaging') of some valuable property right which the property owner possesses by a public entity and the invasion or appropriation directly and specially affected the property owner to his injury." (*Beaty, supra*, 186 Cal.App.3d at p. 903.) Generally speaking, in inverse condemnation, "the government is obligated to pay for property taken or damaged for ' "public use" ' or damaged in the construction of 'public improvements.' " (*Los Angeles, supra*, 194 Cal.App.4th at p. 221, quoting *Customer Co. v. City of Sacramento* (1995) 10 Cal.4th 368, 379–380.) Thus, "[m]ost inverse condemnation actions arise out of unintentional or negligent damage to an owner's property or property interests arising out of the construction of public works." (*Rose v. City of Coalinga* (1987) 190 Cal.App.3d 1627, 1633-1634 (*Rose*); see, e.g., *House v. L.A. County Flood Control Dist.* (1944) 25 Cal.2d 384, 386 [flood damage to property caused by poorly constructed flood control project].)

In the present case, however, the City's abatement actions were taken pursuant to its police power rather than its power of eminent domain. While proof of compensable damages under such circumstances is possible (see *Rose, supra,* 190 Cal.App.3d at p. 1634), it is important not to confuse the two types of situations because the standards for recovery are different and—in the context of the police power—much more limited. Specifically, as a general matter, "the constitutional guaranty of just compensation attached to an exercise of the power of eminent domain does not extend to the state's exercise of its police power, and damage resulting from a proper exercise of the police power is simply *damnum absque injuria* [damage without actionable injury]." (*Lees v. Bay Area Air Pollution Control Dist.* (1965) 238 Cal.App.2d 850, 856 (*Lees*), citing *Gray v. Reclamation District No. 1500* (1917) 174 Cal. 622, 639 (*Gray*); see also *Gin S. Chow v. Santa Barbara* (1933) 217 Cal. 673, 701; *Fallen Leaf Protection Asso. v. State* (1975) 46 Cal.App.3d 816 825 (*Fallen Leaf*), citing *Gray*.) Put another way, "[w]here the police power is legitimately exercised, uncompensated submission is exacted of the property owner if his property be either damaged, taken, or destroyed." (*Gray, supra*, 174 Cal. at

8

p. 640.) Accordingly, if the City's actions in this case constituted a valid exercise of its police power, a complete defense exists to GCP's inverse condemnation claim and summary adjudication of that claim in favor of the City was appropriate.

In reviewing the legitimacy of the City's actions pursuant to its police power, we are mindful of the broad discretion vested in the legislative branch to adopt regulations advancing the public health and safety. Indeed, "[t]he police power is one of the most essential powers of government and one that is least limitable." (*Fallen Leaf, supra,* 46 Cal.App.3d at p. 825.) As our Supreme Court has opined in the nuisance context: " 'Where the Legislature has determined that a defined condition or activity is a nuisance, it would be a usurpation of the legislative power for a court to arbitrarily deny enforcement merely because in its independent judgment the danger caused by a violation was not significant. The function of the court in such circumstances is limited to determining whether a statutory violation in fact exists, and whether the statute is constitutionally valid.' " (*Id.* at p. 826, quoting *City of Bakersfield v. Miller* (1966) 64 Cal.2d 93, 100.) We consider each of these questions in turn.

## C. *Existence of Statutory Violation*

GCP disputes the existence of a statutory violation in this case, arguing that the nuisance conditions on the Property identified by the City and its geotechnical engineers did not constitute either an emergency or an Imminent Hazard in violation of the City's abatement ordinance. The City, however, offered significant evidence that an Imminent Hazard did, in fact, exist on the Property, justifying its remediation efforts. According to the evidence presented by the City in support of its motion, the stability of the partially-excavated hillside on the Property was an issue as early as July 2006, when the Property was first declared to be a public nuisance. The then-owner of the Property, as well as a subsequent purchaser, apparently concurred with this assessment as they both executed the Compliance Plan in October 2008, agreeing to install an approved shoring system on the hillside. By March 2010, however, nothing had been done to fix the problem, the existing temporary shoring and winterization was found to be ineffective, and the stability of the hillside had deteriorated due to a recent winter storm. The City's

9

geotechnical engineers —who had been tracking the worsening conditions on the Property for some time—informed the City that the hillside would continue to deteriorate if not protected before the onset of winter, likely leading to a larger failure of the slope. Based on this expert opinion, the City concluded in May 2010 that conditions at the site were endangering upslope properties and therefore constituted an Imminent Hazard requiring immediate remediation.

In May 2010, the Oakland Municipal Code (OMC) defined geotechnical instability as "[s]ubsidence or lateral displacement of real property which is a hazard to buildings, structures, or portions thereof, to adjacent properties, to the public right-of-way, to a public easement, or to publicly maintained infrastructure."[4] (2008 OMC, § 15.08.340, subd. (P) [identical to current version].) An Imminent Hazard was defined to include "immediately dangerous conditions" due to geotechnical instability that constituted "a clear and certain endangerment to property, or a manifestly unhealthy or unsafe environment for the public . . . ." (*Id.*, § 15.08.380, subd. (C)(1) [identical to current version].) The existence of an Imminent Hazard authorized City officials to proceed with the "immediate abatement" of the dangerous condition. (*Ibid.*) In our view, the situation described by the City in its motion falls squarely within the definition of Imminent Hazard contained in the City's abatement ordinance.

Indeed, GCP did not dispute the existence of geotechnical instability on the Property as identified by the City. Rather, in its opposition to the City's motion it argued

---

[4] During the timeframes relevant to this appeal, there have been a number of revisions to, and/or re-enactments of, the germane provisions of the OMC. We take judicial notice of all such versions. The current version of the OMC was adopted on November 9, 2010, and shall be referred to herein as the OMC. The version in effect in May 2010, when the City issued its declaration of Imminent Hazard, is contained in City of Oakland Ordinance 12842, effective January 1, 2008, and shall be referred to herein as the 2008 OMC. Finally, the version in effect in July 2006, when the City issued its 2006 Declaration, is contained in City of Oakland Ordinance 12451, adopted effective November 1, 2002, and shall be referred to herein as the 2002 OMC (Ordinance 12451 re-adopted City of Oakland Ordinance 12149). Although for purposes of this appeal all three versions are substantially similar, the different versions will be cited as appropriate, with any significant changes noted.

10

only that the instability had not risen to the level of an emergency for purposes of the abatement statute. The basis for GCP's assertion was a single statement by its geotechnical expert indicating that, in his opinion, "[t]here was no emergency or imminent hazard at the site any time from 2006 to the time the City of Oakland began its work at the site in September 2010." Such a conclusory assertion, however, with no specific facts to support it, is wholly inadequate to suggest the existence of a material fact for purposes of blocking an otherwise valid motion for summary adjudication. (Code Civ. Proc., § 437c, subd. (p)(2); *Lyons, supra,* 40 Cal.App.4th at p. 1014; see also *Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117 ["when an expert's opinion is purely conclusory because unaccompanied by a reasoned explanation connecting the factual predicates to the ultimate conclusion, that opinion has no evidentiary value"].) We therefore conclude that no triable issue of material fact was raised with respect to the existence of a statutory violation on the Property. (Compare *Rose, supra,* 190 Cal.App.3d at pp. 1630-1631, 1635 [finding an issue of material fact as to the existence of an emergency justifying demolition of a building in the wake of an earthquake where plaintiff's contractor, plaintiff's architect and the state Office of Emergency Planning all concluded that the building was not a hazard; the building was fenced off; the city waited 57 days to effect the demolition; and the City appears not to have provided any evidence of hazard specific to the building in question].)

D. *Constitutionality of the City's Abatement Process*

With respect to the constitutionality of the City's abatement ordinance, it is well established that a municipality may exercise its police power to protect the public health and safety through the abatement of nuisances. (*Fallen Leaf, supra,* 46 Cal.App.3d at p. 825; see also *Thain v. Palo Alto* (1962) 207 Cal.App.2d 173, 187 (*Thain*).) Thus, "[a] city council may, by ordinance, declare what constitutes a nuisance (*Gov. Code, § 38771*), and may provide for summary abatement of the nuisance at the expense of the person who created it. (*Gov. Code, § 38773.*)" (*Flahive v. City of Dana Point* (1999) 72 Cal.App.4th 241, 244.) Indeed, GPC does not argue here that the City's abatement ordinance is unconstitutional as drafted or that it is an improper expression of the City's

11

police power.  Rather, it maintains that the City's abatement process as applied to GCP violated due process, a contention with which we deal at length below.

1.    *Compliance with the Oakland Municipal Code (OMC)*

GCP argues strenuously that the City did not follow the terms of its own abatement ordinance and failed to notify GCP of the abatement proceedings with respect to the Property as required by the OMC.  Several cases have considered the failure of a governmental entity to follow its own stated process as one factor to consider when determining whether the requirements of due process have been satisfied in the abatement context.  (See *D & M Financial Corp. v. City of Long Beach* (2006) 136 Cal.App.4th 165, 180-182 (*D & M Financial*); *Friedman v. City of Los Angeles* (1975) 52 Cal.App.3d 317, 320 (*Friedman*).)  Our review of the record, however, discloses that the City did substantially comply with the requirements of its abatement ordinance throughout its abatement proceedings with respect to the Property.  Thus, GCP's argument is unavailing.[5]

The City first declared the property to be a public nuisance in July 2006.  At that time, the OMC required that any related "Declaration of Public Nuisance—Substandard" (Declaration) issued by the City be directed to the record owner of the property and contain: (1) information sufficient to identify the property at issue; (2) a statement that the City has found the site to be substandard with a "brief and concise" explanation; (3) a statement of the action required from the property owner; (4) a statement that, if the required work is not done, the City may proceed to cause the work to be done and "charge the costs thereof against the property and the record owner"; (5) a statement advising that any person with record title in the property can request a hearing, along with

---

[5] For purposes of our review of the trial court's summary adjudication of GCP's inverse condemnation claim, we look only at the "papers submitted" with respect to that motion and do not consider the testimony later elicited at trial on the City's cross-complaint for damages.  (See Code Civ. Proc., § 437c, subd. (c).)  Any relevant evidence regarding notice and/or the City's compliance with the provisions of the OMC that was introduced at this subsequent trial is considered later in the context of our review of the City's cross-complaint.  (See footnote 9, *infra*.)

12

the timeframes and procedures for making such a request; and (6) a statement that failure to request a hearing in a timely manner (within 14 days in this case) "will constitute a waiver of all right to an administrative hearing and determination of the matter." (2002 OMC, § 15.08.350 [substantially similar to current version].)

In the present case, the City's letter of July 13, 2006, to the then-record owner of the Property fully complied with these requirements. The OMC further required that any such Declaration be served on the property owner by personal delivery, certified mail and/or certain methods of constructive public notification. (*Id.*, §§ 15.08.110, subd. (B), 15.08.350, subd. (C) [substantially similar to current version].) Again, the City's July 13 letter fulfilled this obligation, indicating that it was mailed by certified mail. Finally, while the OMC also required that a copy of the Declaration be mailed to holders of any mortgage, deed of trust, lease, or other legal interest of record "known to the Building Official or disclosed from official public records" (*Id.,* § 15.08.350, subd. (C) [substantially similar to current version]), GCP's deed of trust was not recorded against the Property until October 2008, and thus no notice to GCP was required at the time the public nuisance was initially declared over two years earlier.

Pursuant to the City's abatement ordinance, if a property owner has not complied with the abatement requirements set forth in a Declaration and the time for appeal has expired, the Building Official must record a "certificate" with the Alameda County Clerk-Recorder. (2008 OMC, § 15.08.360 [identical to current version]; see also 2002 OMC, § 15.08.360 [substantially similar].) This certificate need not meet the requirements of a full-blown Declaration, but must instead only describe the property and indicate that a public nuisance exists and that the record owner of the property has been notified. (*Ibid.*) Here, the documents recorded by the City in April 2010 fulfill these requirements. While it is true that, by April 2010, GCP's deed of trust had been recorded against the Property, there is no requirement in section 15.08.360 that notice of the recording of such a certificate be provided to any party. (*Ibid.*) Thus, once again, the City was in compliance with its code provisions.

13

Finally, on May 11, 2010, the City declared the Property to be an Imminent Hazard pursuant to subdivision (C)(1) of OMC section 15.08.380.  As discussed above, the existence of an immediately dangerous condition based on geotechnical instability authorized the City to declare the existence of an Imminent Hazard and proceed with the immediate abatement of the problem.  (2008 OMC, § 15.08.380, subd. (C)(1) [identical to current version].)  Under such circumstances, no previous declaration that the property at issue was substandard or a public nuisance is required.  (*Ibid.*)  Further, recognizing the time-sensitive nature of such abatement proceedings, the statute provided for a more streamlined notice and hearing process than that required for the general declaration of a public nuisance, stating: "Whenever the Building Official will cause . . . the immediate abatement by the City or its contractors of all dangerous and perilous conditions or defects or both, reasonable measures shall be taken to notify the record owner of the property of the pending abatement actions, including, but not limited to, visual communication by posting of the premises and oral communication by telephone or in person and written communication by personal delivery or telegraph or facsimile, unless circumstances and time do not otherwise warrant and permit."  (2008 OMC, § 15.08.380, subd. (C)(2).)

In the present case, the City's May 11, 2010, letter to the then-owner of the Property satisfied this notice requirement.  At that point, GCP was the holder of a deed of trust with respect to the Property, but was not the record owner.  Thus, no notice to GCP was required.  Similarly, subdivision (C)(3) of OMC section 15.08.380, which provided for an expedited hearing process with respect to the declaration of imminent hazard, was only available to the then-record owner of the Property, not to holders of deeds of trust such as GCP.  Here, the City notified the record owner of the Property regarding its appeal rights in the May 2010 letter, and no appeal was filed.  At that point, the City had complied with all relevant

14

provisions of the OMC and was authorized by statute to effect the immediate abatement of the Property.[6]

GCP's argument in this case, in effect, amounts to a claim that the City must restart the notice and hearing process under its abatement statute for every succeeding owner of a substandard property. The statute, however, contains no such obligation, and we decline to interpret it to require multiple notifications. In reaching this conclusion, we find *Hawthorne Savings & Loan Association v. City of Signal Hill* (1993) 19 Cal.App.4th 148 (*Hawthorne*) instructive. In *Hawthorne*, the city had noticed a previous owner of that owner's right to repair or demolish a substandard building as required by section 17980 of the Health and Safety Code, but had not similarly noticed Hawthorne, who had acquired the property through foreclosure during the pendency of the abatement process. (*Hawthorne, supra,* 19 Cal.App.4th at pp. 153, 161-162.) The city argued that being required to give notice to each succeeding purchaser of a right to repair or demolish would frustrate the city's code enforcement program "because it would subject enforcement to indefinite delay where . . . the property is continuously transferred from one owner to another." (*Id.* at pp. 161-162.) The appellate court agreed, stating: "We see no reason why, under the statute or the dictates of due process, a new time period has to be extended each time the property changes ownership." (*Id.* at p. 162.) Citing to related provisions requiring recorded notice of the commencement of abatement proceedings, the appellate court concluded that due process was satisfied so long as succeeding owners were put on notice that an option to repair or demolish had been offered and told the timeframe within which

---

[6] Once GCP became the record owner of the Property on June 9, 2010, it arguably had the right to appeal "from orders, decisions, or determinations made relative to the applications and interpretations of Article X of [the OMC]." (2008 OMC, § 15.08.100, subd. (B).) Article X contains the definitions regarding what constitutes a public nuisance. It is not clear whether this appeal right would be available in case of an Imminent Hazard, which has its own appeal process and is located in Article XI. However, even if applicable, there was no requirement that the City notify GCP of the existence of this appeal right.

15

that option had to be exercised. (*Ibid.*)[7]  Similarly, in the present case, the City was not required by the terms of its abatement ordinance to notify GCP of the existence of the 2006 Declaration when GCP became the holder of a deed of trust with respect to the Property in 2008.  Nor was the City required by the OMC to notify GCP of its May 2010 decision to declare the Property an Imminent Hazard once GCP became record owner of the Property in June 2010.

     2.     *General Notions of Due Process*

Our conclusion that the City complied with the relevant provisions of its abatement ordinance throughout its proceedings with respect to the Property does not, however, end our inquiry.  Rather, even though the City acted pursuant to both State law and local ordinance providing for the summary abatement of nuisances, all such enactments are subject to constitutional requirements of due process.  (*People ex rel. Camil v. Buena Vista Cinema* (1976) 57 Cal.App.3d 497, 502 [discussing additional due process requirements necessary prior to the abatement of allegedly obscene films]; *Leppo v. City of Petaluma* (1971) 20 Cal.App.3d 711, 718 (*Leppo*).)  As the Second District stated in *Friedman*:  "Under its police power to protect public health and safety a city may destroy private property without liability to the property owner, but when it does this it must afford the owner due process of law."  (*Friedman, supra,* 52 Cal.App.3d at p. 321.)  Absent an emergency, due process in the abatement context generally requires notice and an opportunity to be heard.  (*Ibid.*; see also *Thain, supra,* 207 Cal.App.2d at p. 189.)  Moreover, where, as here, property has changed hands during abatement proceedings, due process may require some form of notice and/or opportunity to be heard for the new owner over and above that required by the express terms of the abatement

---

[7] Consistent with the interpretation of section 17980 of the Health and Safety Code in *Hawthorne*, the statute was amended in 2012 to provide certain explicit rights to subsequent purchasers.  Specifically, the revised statute now allows new purchasers of certain foreclosed residential properties who are "in the process of diligently abating any violation" 60 days from the date of purchase before the commencement of any abatement proceedings with respect to the substandard property.  (Health & Saf. Code, § 17980, subd. (a), added by Stats. 2012, ch. 201 (A.B. 2314), § 2.)

16

statute. (*Friedman, supra,* 52 Cal.App.3d at p. 322 [reliance on tax rolls for notice purposes as permitted by local ordinance does not satisfy due process for subsequent owner; use of 16-month old title search also inadequate; "city cannot reasonably rely on former property owners to give notice of prospective demolition to present owners"].)

We believe, however, that the requirements of due process were satisfied under the facts of this case. First, once GCP became the record owner of the Property on June 9, 2010, it had constructive notice of the existence of the abatement activities on the Property based on the City's April 29, 2010, recordation of its abatement certificate. (Civil Code, §§ 1213 ["conveyance" of real property "acknowledged or proved and certified and recorded as prescribed by law from the time it is filed with the recorder for record is constructive notice of the contents thereof to subsequent purchasers"], 1215 [defining " 'conveyance' " to include written instruments encumbering an interest in real property or affecting title to real property]; Gov. Code, §§ 27279, subd. (a) [definition of " '[i]nstrument' "], 38773 [authorizing local ordinances for the summary abatement of nuisances], 38773.5, subd. (e) [authorizing recordation of abatement notices]; 2008 OMC, § 15.08.360 [local requirements for recordation of abatement certificate].) This certificate told GCP as new owner that—as recently as six weeks prior to its purchase— there was a "nuisance or substandard or hazardous or injurious condition" on the Property; that the owners had not corrected the problem; that the City had commenced abatement proceedings; and that the City had a "lawful claim of an accumulating dollar amount" against the Property to reimburse it for its abatement costs. Clearly, GCP was on notice that a prompt investigation of conditions on the Property was warranted. (Compare *Whiting v. Pasadena* (1967) 255 Cal.App.2d 372, 376-377 [notice of completion of demolition recorded two months prior to purchase at a trustee's sale adequate notice of special assessment for the costs of such demolition].)

Further, "[a] party to a real estate conveyance is not entitled to ignore any information pertinent to title that comes to him or her, even from outside the recorded chain of title, to the extent such information puts him or her on reasonable inquiry notice of information that may bring into question the state of title." (*In re Marriage of Cloney*

17

(2001) 91 Cal.App.4th 429, 441-442; see also Civil Code section 19 ["Every person who has actual notice of circumstances sufficient to put a prudent man upon inquiry as to a particular fact, has constructive notice of the fact itself in all cases in which, by prosecuting such inquiry, he might have learned such fact"].) Here, as early as October 2008, when GCP loaned money to the then-owner of the Property and recorded its deed of trust, it had knowledge that the City had some kind of performance issue with respect to the Property. Specifically, GCP provided the money for a $250,000 performance bond and these funds were to be returned directly to GCP " 'once the terms of the Compliance Plan have been satisfied.' " Since the money was never returned to GCP and GCP subsequently received title to the Property from a trustees' deed of sale, it is reasonable to assume that GCP was aware that the prior owner had never performed as required by the City and that issues remained with respect to the Property. (Compare *Whiting v. Pasadena, supra,* 255 Cal.App.2d at pp. 376-377 [where property on which house was demolished was foreclosed on default, notice of demolition was recorded, and the city was the only potential demolisher other than the defaulting owner, prospective buyer "should have examined the city's assessment rolls" to protect his interests].)

Finally, at its meeting with City officials on August 25, 2010, GCP received actual notice of the City's pending abatement plans with respect to the Property. At that meeting, the City agreed to allow GCP an opportunity to assess the situation and submit its own proposal, but indicated that work would need to begin "in early September to assure that the excavated site would be substantially restored in advance of the winter inclement weather season." As of September 8, 2010, the City had not received a proposal or any permit applications from GCP. It therefore notified GCP that it intended to move forward with the planned abatement work on September 13. While the timeframe allowed by the City for GCP's response was short, we do not find it unreasonable under the circumstances and given the nature of the Imminent Hazard

18

existing on the Property.[8]  Moreover, GCP never requested administrative review of the City's decision to proceed.  It did, however, request judicial review when it filed its application for a temporary restraining order on September 27, 2010.  The application—which alleged many of the same issues raised in this appeal—was denied on the same day after GCP received a hearing in which it was able to air its concerns with respect to the City's abatement actions.  Based on all of these circumstances, we conclude that the notice and opportunity to be heard afforded GCP in this case was sufficient for purposes of due process.

GCP's reliance on *Friedman* and *D & M Financial* does not change our analysis. In *Friedman,* a subsequent purchaser had <u>no</u> notice of the demolition of a building on his property.  (*Friedman, supra,* 52 Cal.App.3d at pp. 320-321.)  Also, the court found that the provisions of the local abatement ordinance, themselves, violated due process by allowing notice to the owner listed on the tax rolls, which are "not an accurate and timely source of information." (*Id*. at p. 322.)  Additionally, the city failed to follow its own customary inter-departmental procedures.  (*Id.* at p. 320.)  Finally, and most importantly, the court opined that recordation of a notice to demolish would have taken care of the due process issue with respect to new owners:  "A new owner would then have notice of the city's projected action and could take appropriate steps to avoid loss.  Had a proper notice been recorded, Friedman might never have purchased the property or might have acted promptly to repair the building and forestall the need for its demolition." (*Id.* at p. 322.) Similarly, in *D & M Financial*, the city violated its own notice statutes and policies with respect to the demolition of a substandard building such that the holder of a deed of trust

---

[8] Although appellant makes much of the fact that no emergency was present on the Property, we view the Imminent Hazard in this case as existing somewhere in between an emergency and a typical public nuisance for due process purposes.  The City's abatement ordinance reflects this, containing streamlined notice and appeal provisions where an Imminent Hazard has been declared.  (2008 OMC, § 15.08.380, subds. (C)(2) & (C)(3).) Clearly, had the situation been deemed a true emergency, the City would have had the absolute right to enter the Property and abate the nuisance without *any* prior notice or hearing.  (*Leppo, supra,* 20 Cal.App.3d at p. 718; *Thain, supra,* 207 Cal.App.2d at p. 190.)  Here, in contrast, we conclude that some process was due.

19

on the property received no notice until the day before the scheduled demolition. (*D & M Financial, supra,* 136 Cal.App.4th at pp. 172-173, 181.) In addition, the court found the recorded notice in the case to be defective because it failed to indicate that demolition was a possibility. (*Id.* at pp. 178-179.) Moreover, neither *Friedman* nor *D & M Financial* dealt with a situation involving an Imminent Hazard. Here, in contrast, the City followed the provisions of its abatement ordinance, which was not constitutionally infirm, and GCP had actual and constructive notice of the proposed abatement proceedings with respect to the Property and of the need to proceed quickly with the proposed remediation. There was no violation of due process.

### III. NONSUIT ON ACTION FOR TRESPASS

GCP also appeals from the trial court's grant of a nonsuit in favor of the City with respect to GCP's cause of action for trespass. As discussed above, the trial court determined in connection with the summary adjudication of GCP's inverse condemnation claim that the City's entry onto the Property was a valid exercise of its police power. Since the City's actions were authorized by law, the trial court concluded that the City was also immune from liability for trespass. It therefore granted the City's motion for nonsuit at the conclusion of GCP's opening statement with respect to the trespass claim.

"A defendant is entitled to nonsuit after the plaintiff's opening statement only if the trial court determines that, as a matter of law, the evidence to be presented is insufficient to permit a jury to find in the plaintiff's favor." (*Ewing v. Northridge Hospital Medical Center* (2004) 120 Cal.App.4th 1289, 1296.) "We independently review the ruling on a motion for nonsuit, guided by the same rules that govern the trial court." (*Ibid.*) Thus, we will not sustain the judgment " 'unless interpreting the evidence most favorably to plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences and doubts in favor of the plaintiff a judgment for the defendant is required as a matter of law.' " (*Carson v. Facilities Development Co.* (1984) 36 Cal.3d 830, 839, quoting *Mason v. Peaslee* (1959) 173 Cal.App.2d 587, 588.)

We agree with the trial court's conclusion in this case that the City was entitled to a nonsuit on GCP's claim of trespass. Trespass is the unlawful entry onto property in

another's possession without consent. ( Rest.2d Torts, §§ 158, 167; see also *Martin Marietta Corp. v. Insurance Co. of North America* (1995) 40 Cal.App.4th 1113, 1132.) Since, to be actionable, any such entry must be unlawful, it stands to reason that "[a] public employee is not liable for an injury arising out of his entry upon any property where such entry is expressly or impliedly authorized by law." (Gov. Code, § 821.8.) Further, independent contractors are treated as if they are public employees for purposes of this immunity provision. (*Id.*, § 815.4.) Finally, subdivision (b) of section 815.2 of the Government Code states: "Except as otherwise provided by statute, a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability." Thus, the City is immune from liability for trespass in this case if its entrance onto the Property (through its employees and independent contractors) was "expressly or impliedly authorized by law." As the trial court concluded—and as we have previously affirmed—the City's actions in this case constituted a valid exercise of its police power and were therefore authorized by law. Consequently, we find no error in the trial court's judgment of nonsuit against GCP with respect to its trespass claim.

## IV. CROSS-COMPLAINT FOR DAMAGES

As a final matter, GCP urges reversal of the trial court's allowance of damages to the City, arguing that the award of $310,315.18 was not supported by "any" evidence and was improper because the City failed to follow the procedural requirements of its nuisance abatement ordinance. We have previously concluded that the City did, in fact, follow the procedural requirements of its abatement ordinance, that its abatement of the

21

Property was appropriate, and that the City did not violate GCP's due process rights.[9] We therefore turn to GCP's contention that the trial court's damages ruling was not supported by the evidence.

A trial court's resolution of disputed factual questions is reviewable for substantial evidence. (*Citizens for a Better Eureka v. California Coastal Com.* (2011) 196 Cal.App.4th 1577, 1584.) When findings of fact are challenged on appeal for lack of such evidence, our power begins and ends with a determination of whether there is any substantial evidence, contradicted or uncontradicted, to support the trial court's findings. *(Thompson v. Tracor Flight Systems, Inc.* (2001) 86 Cal.App.4th 1156, 1166.) "We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor . . . ." (*Ibid.*, quoting *Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660.)

---

[9] The additional evidence and witness testimony presented at trial on the City's cross-complaint for damages did nothing to advance GCP's argument that the City's process was improper, and, in fact, tended to bolster the trial courts earlier findings to the contrary. Thus, for instance, the City's geotechnical expert, Ken Ferrone, testified that there was a high probability that unstable slopes on the Property could fail in the near future, impacting adjacent properties. The trial court expressly found this testimony highly credible with respect to the inadequacy of the existing shoring on the site and the likelihood of its eventual failure. In contrast, the trial court found the testimony of GCP's expert, Lawrence Karp, that the Property was stable to be less credible and ultimately unpersuasive. We defer to these credibility findings. (*Lenk v. Total-Western, Inc.* (2001) 89 Cal.App.4th 959, 968.) In addition, evidence that the unstable hillside supported two apartment buildings underscored the need for prompt action on the part of the City.

With respect to the notice issue, Shawn Hammond, a GCP principal, testified that he was aware of the City's plans with respect to the Property as early as late June or early July in 2010, substantially before the August 25 meeting with the City. In addition, Greg Stuman, another GCP representative, testified that the 2008 loan made by GCP with respect to the Property was asset-based, that is entirely dependent upon the condition and value of the Property. He testified further that he was aware in 2008 that the then-owner of the Property had no money and was not paying his contractor. Finally, Mr. Stuman testified that he never reviewed a title report in connection with GCP's foreclosure of the Property. The trial court specifically found the testimony of GCP's representatives that they had no prior knowledge of the City's concerns with respect to the Property unpersuasive. It also expressly found that no GCP representative ever requested an appeal hearing.

In the present case, the City sought damages pursuant to its local abatement ordinance, which provides in relevant part: "The fees and costs incurred and the penalties assessed and the interest accrued in . . . repairing, cleaning, remediating, removing, or demolishing a building, structure, or real property, including costs incurred  . . . in ascertaining violations or affecting abatement thereof and in collecting such fees, costs, penalties, and accruing interest shall be charged against the property and owners." (2008 OMC, § 15.08.130, subd. (A) [identical to current version].)  The statute goes on to state that the City's Master Fee Schedule shall be used as a basis for establishing fees, costs, penalties and interest in such cases. (*Ibid*.)  Finally, these charges may be recovered by the City through "all appropriate legal means," including a civil court action brought by the City. (*Ibid*.)

To prove its damages claim for $310,315.18, the City presented evidence in the form of a summary invoice showing all funds received and charges incurred by the City with respect to its abatement activities on the Property.  The summary invoice included credits for use of bond proceeds, amounts payable to contractors, costs for project-related City staff time, and applicable fees.  In addition, Diana Rex—the City employee responsible for the preparation of this summary invoice—testified regarding how the invoice was compiled, how charges for City staff time were calculated, and how fees were determined in accordance with the City's Master Fee Schedule.  At trial, GCP conceded that $203,492.94 claimed by the City for payments to its independent contractors was "established by competent evidence."  It's quarrel was with the costs charged for City staff time and with the fees for general overhead included in the invoice pursuant to the City's Master Fee Schedule.  We believe that substantial evidence substantiates the charges allowed by the trial court for City staff time.  Moreover, the City's abatement statute expressly allows for the recovery of fees as set forth in the City's Master Fee Schedule.  Absent specific evidence of its invalidity, we will assume that the City's Master Fee Schedule was properly adopted and adequately justifies the imposition

23

of the administrative fees assessed in this case.  We therefore conclude that the trial court's damages award was supported by substantial evidence.[10]

## V.  DISPOSITION

The judgment is affirmed.  Respondent is entitled to its costs on appeal.

_____
REARDON, J.

We concur:


_____
RUVOLO, P. J.


_____
RIVERA, J.

---

[10] In reviewing the sufficiency of the evidence, we are sympathetic to the City's argument that "an appellant who contends that some particular finding is not supported is required to set forth in his brief a summary of the material evidence on that issue" or the matter is deemed waived. (*Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 737.)  This GCP did not do.  However, even overlooking this deficiency, we find GCP's challenge to the sufficiency of the evidence unpersuasive for the reasons set forth herein.